Isidok Wasservogel, Spec. Eef.
This is a representative Lien Law action wherein plaintiff, a materialman, seeks to recover from and to have James Talcott, Inc., a factor, account for alleged diverted trust funds received by said defendant from one Baker-Smith & Co., Inc., a building subcontractor.
Prior to June, 1955, Paul Tishman General Contractor, Inc. (hereinafter referred to as “Tishman”) and Baker-Smith & Co., Inc. (hereinafter referred to as “ Baker-Smith ”) entered into certain agreements whereby the latter was to furnish labor and materials for the ventilating and heating of the Roosevelt Hospital in the City of New York. Between June 22 and June 27, 1955, plaintiff, at the request of Baker-Smith sold to it materials in the aggregate amount of $2,500.79 and delivered same to the site of the Tishman job at the Roosevelt Hospital. During the period between April 21, 1955 and August 19, 1955, Baker-Smith, as Tishman’s subcontractor, received payments from Tishman, by a series of four checks in various sums total-ling more than $47,500. These four checks were indorsed and delivered by Baker-Smith to James Talcott, Inc. (hereinafter referred to as “Talcott”) pursuant to the provisions of a factoring agreement in effect between them since February, 1954. It is plaintiff’s contention that these funds constituted trust funds under the applicable provisions of the Lien Law, which were required to be used first for the payment of claims of plaintiff and others similarly situated. Plaintiff alleges that by the acceptance of said checks and the retention of the proceeds thereof, Talcott, with knowledge of their source and origin, participated with Baker-Smith in the diversion of these trust funds.
Talcott’s 1954 factoring agreement with Baker-Smith was on a nonnotification basis. Accordingly, Tishman, purportedly unaware of the arrangement between Baker-Smith and Talcott, paid Baker-Smith directly upon presentation to it of an invoice. Baker-Smith, pursuant to its factoring agreement and its assignments thereunder to Talcott of all accounts receivable, then indorsed and turned over the Tishman checks to its factor. It is Talcott’s position here that under subdivision (7) of section 13 of the Lien Law, its prior advances to Baker-Smith, in consideration for the latter’s assignments, were trust funds to which plaintiff should have looked for payment, rather than to *1034 tlie four Tishman checks which, Talcott alleges, were its property in repayment of these advances. Thus, in addition to a general denial, Talcott’s answer sets forth nine separate defenses, to wit:
1 — Talcott accepted the checks constituting the claimed diverted funds in good faith and without notice of plaintiff’s alleged rights thereto;
2 — Such moneys were received by Talcott pursuant to an agreement and without notice of plaintiff’s claim;
3 — The moneys received by Talcott were a repayment of similar moneys it had advanced;
4 — Talcott disbursed funds to Baker-Smith pursuant to a valid contract and without notice of plaintiff’s claim;
5 — Plaintiff should have known of the factoring arrangement between Baker-Smith and Talcott; plaintiff failed to give Talcott notice of its unpaid claim for materials;
6 — Laches;
7 — The materials furnished by plaintiff did not become a part of the permanent improvement;
8 — Defendant is not a proper party defendant;
9 — Statute of Limitations.
Prior to considering in detail the respective positions of the parties regarding the applicability of either section 36-b of the Lien Law as urged by plaintiff or subdivision (7) of section 13 of the Lien Law, as, in effect, is set forth in the third and eighth defenses, the various other seven defenses interposed by Talcott may be disposed of without lengthy discussion. In the opinion of the court, none of these other defenses constitute an effective bar to plaintiff’s action. The first, second and fourth defenses relating to defendant’s alleged lack of knowledge of plaintiff’s status as an unpaid materialman are without merit. The record clearly establishes that Talcott was intimately familiar with Baker-Smith’s operations. As their factoring agreement indicates, Talcott had loaned money to Baker-Smith for its various business enterprises at least since February, 1954. It required, and admittedly received from Baker-Smith copies of all its invoices and payment requisitions and, thus, knew or could have known of all work, labor and materials furnished by or on behalf of Baker-Smith. Moreover, Talcott repeatedly audited the books and records of Baker-Smith, which, in the opinion of the court, were sufficient in and of themselves to endow Talcott with knowledge of Baker-Smith’s outstanding obligations. If Talcott blandly chose to ignore or disregard these books and records, and the information and entries contained therein, which, as their auditor’s reports clearly show, contained the specific amounts Baker-Smith owed others, it may not now take advan *1035 tage of its own complacency. (See Wynkoop v. Mintz, 17 Misc 2d 1093.)
The fifth and sixth defenses (supra), in effect, suggest that plaintiff’s failure to reduce its claims to judgment against Baker-Smith or to take other steps to enforce these claims, preclude recovery here. In view of that portion of section 36-b of the Lien Law which provides for enforcement of a material-man’s claim against trust funds “ whether or not he shall have filed, or had the right to file, a notice of lien or shall have recovered a judgment for a claim arising out of the improvement,” such defenses are without merit. In any event, Talcott’s failure to file its assignments from Baker-Smith, as provided for in section 15 of the Lien Law (see, also, Lien Law, § 13, subds. [1-a], [5]), undoubtedly was the principal cause for plaintiff’s unawareness of the factoring arrangement between these corporations. Contrary to Talcott’s contentions, therefore, plaintiff was in no position to give it notice of its claim directly (even if such notice were required) or to advise Talcott that Baker-Smith had not paid for the materials here involved.
The seventh defense, a contention that the materials furnished by plaintiff did not become, part of the permanent improvement, is also without merit. No such ■ requirement exists in the applicable Lien Law.' A materialman who is protected under the trust provisions of the Lien Law is merely defined therein as “ any person who furnishes material * * * either to an owner, contractor or subcontractor, for, or in the prosecution of such improvement ” (Lien Law, § 2, subd. 12; italics supplied). Delivery of the materials to the site of the improvement, even without proof of incorporation therein, would be sufficient to establish a valid lien in favor of the materialman. (Giant Portland Cement Co. v. State of New York, 232 N. Y. 395, 402-406; see Blanc, New York Law of Mechanics’ Liens, § 9i, p. 34 el seq.)
Talcott’s plea of the Statute of Limitations is not supported by the facts. Plaintiff’s materials were delivered in June, 1955. The improvement was completed in January, 1956. This action was commenced in June, 1956, well within one year after the completion of the improvement, as required by law (Lien Law, § 75; Wynkoop v. Mintz, supra).
The remaining defenses set forth in Talcott’s answer, in effect, principally deal with the factor’s insistence that the provisions of subdivision (7) of section 13 of the Lien Law, compel plaintiff to look for payment only to the funds which Baker-Smith had received as advances from Talcott and not to any moneys which it had obtained from Tishman, which áre the subject matter of this lawsuit. It is necessary, therefore, to examine; *1036 the provisions of subdivision (7) of section 13 and section 36-b of the Lien Law, which, respectively, concern moneys received by a contractor or subcontractor (1) under an assignment of moneys and (2) from an owner, contractor, or other subcontractor for the improvement of real property.
Subdivision (7) of section 13, which Talcott urges is controlling here, provides as follows:
“ The moneys received by a contractor or subcontractor under my assignment of moneys or any part thereof, due or to become due under a contract for the improvement of real property, whether or not such assignment contains the covenant required by subdivision six of this section, are hereby declared to be trust funds in the hands of such contractor or subcontractor to be first applied to the payment of claims of subcontractors, architects, engineers, surveyors, laborers, and materialmen arising out of the improvement and to the payment of premiums on surety bond or bonds filed and premiums on insurance accruing during the making of the improvement. Any contractor or subcontractor and any officer, director or agent of any contractor or subcontractor who applies or consents to the application of such moneys for any other purpose and fails to pay claims hereinbefore mentioned, is guilty of larceny and is punishable as provided in section thirteen hundred and two of the penal law. Such trust may be enforced by civil action maintained as provided in article three-a of this chapter by any person entitled to share in the fund, whether or not he shall have filed, or had the right to file, a notice of lien or shall have recovered a judgment for a claim arising out of the improvement. For the purposes of a civil action only, the trust funds shall include the right of action upon an obligation for moneys due or to become due to a contractor or subcontractor, as well as moneys actually received by him.
“ Nothing in this subdivision shall be considered as imposing upon the assignee any obligation to see to the proper application of the moneys advanced under such assignment by the assignee.” (Italics added.)
As above noted, this section deals with funds received by a subcontractor such as Baker-Smith from an assignee such as Talcott. Concededly, as Talcott urges, the provisions of this section made such funds available to plaintiff had it sought to enforce its rights as an unpaid materialman against them. Significantly, however, these funds have long since been dissipated by Baker-Smith, which has been adjudged a bankrupt. Thus, none of the moneys advanced by Talcott now remain with Baker-Smith for payment of plaintiff’s claims. The possibility of *1037 plaintiff heretofore reaching- these advances by Talcott to Baker-Smith was, as above stated, in large measure prevented by Talcott’s own failure to comply with the filing requirements of the Lien Law, which, at the very least, would have put plaintiff and other similar claimants on notice of the fact that Baker-Smith was factoring its accounts receivable and obtaining advance funds therefor from Talcott.
Nevertheless, although no useful purpose would be served at this time in an attempt by plaintiff to enforce its rights against Baker-Smith under the provisions of subdivision (7) of section 13, as urged by Talcott, there is no reason why it may not now seek to recover payment under the trust fund provisions of section 36-b. Contrary to Talcott’s contention, nothing in the law makes either subdivision (7) of section 13 or section 36-b an exclusive remedy or prohibits the use of one when existing rights under the other may no longer be successfully enforced. On the contrary, the development of the statutory Lien Law as it exists today in New York from its common-law antecedents, clearly demonstrates a concerted effort by legislative edict and judicial interpretation to broaden the protection afforded those whose labor and materials are used in the improvement of real property. Historically, at common law, a contractor could, by way of assignment of a contract or moneys earned thereunder, transfer to a third party a fund which was created through labor and materials furnished by subcontractors and from which fund such subcontractors expected to be paid therefor (Bates v. Salt Springs Nat. Bank, 157 N. Y. 322, 327 et seq.). After such assignment, claims upon this fund derived from or through the contractor, could of course, attach only to such interest therein as the contractor had retained. For the protection of persons such as plaintiff, who might furnish labor and materials to a contractor or subcontractor upon the expectation or promise that payment would be made to them out of moneys earned by said contractor or subcontractor, the Legislature in New York enacted the filing requirements of the Lien Law, which were intended to afford these persons notice of an assignment of a contract or moneys earned thereunder. The statute was not intended to confer upon an assignee any rights which he did not have at common law. Bather, it was intended to impose new conditions and limitations upon his assertion of common-law rights (Lee v. Bailey Corp., 267 N. Y. 161, 164; Arrow Iron Works v. Greene, 260 N. Y. 330, 340-341; Feinstein v. Major Constructors, 245 App. Div. 530, 531-532; Blanc, New York Law of Mechanics’ Liens, par. 105, p. 596 et seq.). Subsequently, by the addition of a new article 3-A and the trust fund provisions of *1038 the Lien Law with the civil remedies thereby afforded plaintiff and others similarly situated, such persons were given still greater protection and opportunity to insure prior payment of their claims. The obvious result of this legislative history was to broaden the scope of the lien laws in an effort to do away with any machination tending to take advantage of the rights of materialmen and laborers to reach funds obtained by an owner, contractor or subcontractor from the improvement of real property.
To adopt Talcott’s narrow interpretation of the trust provisions of the statute, particularly in view of its own failure to comply therewith, would frustrate the very intendment of the law which obviously seeks to aid claimants such as plaintiff (see 1959 Report of N. Y. Law Revision Comm.; N. Y. Legis. Doc. No. 65[F]). Had the Legislature intended to limit plaintiff’s remedies to the extent advocated by Talcott, it certainly could and would have so stated. Instead, both cited sections of the Lien Law, as well as others not here involved, by their explicit and express language, were enacted for the benefit of a designated class of beneficiaries, including materialmen such as plaintiff (Century Ind. Co. v. Bank of Gowanda, 35 N. Y. S. 2d 396, 397-398, affd. 263 App. Div. 1068). Significantly, lenders and factors such as Talcott are in no way afforded the remedies of the law available to plaintiff and others similarly situated.
No limitation or preference regarding the availability of any of the trust fund provisions of the Lien Law are set forth anywhere in this statute. Section 36-b of the Lien Law, pursuant to which plaintiff seeks to recover here, provides as follows:
“Subcontractor who diverts funds guilty of larceny; civil remedy to enforce trust.
‘ ‘ The funds received by a subcontractor from an owner or contractor or subcontractor for the improvement of real property are hereby declared to constitute trust funds in the hands of such subcontractor to be applied first to the payment of the claims of the subcontractors, laborers and materialmen, arising out of the improvement and to the payment of premiums, on surety bond or bonds and premiums on insurance accruing during the making of the improvement and any subcontractor and any officer, director or agent of any subcontractor who applies or consents to the application of such funds for any other purpose and fails to pay the claims hereinbefore mentioned is guilty of larceny and punishable as provided in section thirteen hundred and two of the penal law. Such trust may be enforced by a civil action maintained as provided in article three-a of this chapter by any person entitled to share in the fund, whether *1039 or not he shall have filed, or had the right to file, a notice of lien or shall have recovered a judgment for a claim arising out of the improvement. For the purpose of a civil action only, the trust funds shall include the right of action upon an obligation for moneys due or to become due to a subcontractor, as well as money actually received by him.” (Italics added.)
Unlike subdivision (7) of section 13, section 36-b makes available to plaintiff, as a materialman, the funds which Baker-Smith received from Tishman. Talcott’s contention that this section can apply “ only if Baker-Smith was not being financed ” is untenable. Nothing in either section, in the legislative history of the Lien Law, or in any other provision of this statute so provides, nor has any reported case so holding come to the attention of the court. Talcott apparently assumes that its private financing arrangement with Baker-Smith, which in itself was not in compliance with the requirements of the Lien Law (see § 13, subds. [1-a] and [5]; § 15), is superior to a statutory trust clearly designed and created for the protection of claimants such as plaintiff. This'assumption is specious and unwarranted. A use of trust funds for any purpose outside the trust constitutes a diversion of such funds and is one of “ the very evils.the trust fund provisions '[of the Lien Law] were designed to overcome.” (1959 Report of N. Y. Law Rev. Comm., N. Y. Legis. Doc. No. 65 [F], p. 13.)
The credible testimony and documentary evidence establish that each of the four checks drawn by Tishman to the order of Baker-Smith, together with Talcott’s intimate knowledge of its assignor’s obligations, operations, books and records, in the opinion of the court, constitute sufficient notice to Talcott that these payments to Baker-Smith were trust funds under section 36-b of the Lien Law. In accepting said checks in the same physical form as received by Baker-Smith, and retaining the proceeds thereof, to the detriment of claimants such as plaintiff and in violation of their statutory protected rights, Talcott must be deemed to have participated with Baker-Smith in the diversion of such trust funds, notwithstanding their private factoring agreement and unfiled assignments of accounts receivable.
Talcott argues that had Baker-Smith turned the Tishman funds over to plaintiff in contravention of the factoring agreement, Baker-Smith would have been guilty of larceny, inasmuch as it is Talcott’s position that these funds were its property and not subject to plaintiff’s claims. The court does not agree with this conclusion which, in effect, presupposes that Talcott’s rights to such funds are paramount or superior to those of plaintiff *1040 and all other similar claimants in whose behalf this action was instituted. In any event, whatever the undisclosed relationship was between Talcott and Baker-Smith at the particular time of the receipt of the four checks by the latter, or the legal effect of their private financing contract between them, neither this relationship nor the effect thereof could serve to defeat an unpaid job claimant’s statutory rights under the trust provisions of the Lien Law. At best, in the absence of notice to plaintiff, as provided for in the Lien Law, Talcott had a mere equitable claim to these funds when received by Baker-Smith. That is the sole import of the unfiled assignments of their accounts receivable by Baker-Smith to Talcott insofar as this action by plaintiff is concerned. Plaintiffs ’ statutory lien and its right to payment from such funds clearly take priority now over any rights which Talcott has as Baker-Smith’s assignee. Certainly, under the circumstances of the transaction here involved, Baker-Smith was obligated to pay plaintiff first from any funds it received from Tishman. It is elementary, therefore, that Talcott’s rights as assignee of the same funds, with full knowledge of their trust nature, can in no event exceed those of its assignor. It necessarily follows that Talcott’s retention of the moneys evidenced by the four checks, particularly in view of said knowledge of plaintiff’s rights thereto, was improper and constituted a diversion of trust funds for which it must now account.
Parenthetically, and contrary to Talcott’s contention, had the moneys gone directly from Tishman to Talcott, plaintiff, as an unpaid materialman, would still be entitled to the protection afforded it by the trust fund provision of the Lien Law (Wade v. Nassau Suffolk Lbr. & Supply Corp., 275 App. Div. 864). A trust, statutory or otherwise, is governed by common-law principles. Thus, trust funds do not lose their character as such merely by being deposited in a bank for the individual credit and account of a person whom the law, in effect, makes a trustee (Century Ind. Co. v. Bank of Gowanda, 35 N. Y. S. 2d 396, 398, supra; Bischoff v. Yorkville Bank, 218 N. Y. 106, 111-112; Roca v. Byrne, 145 N. Y. 182, 186-187). Inasmuch as Talcott knew that its credits to Baker-Smith, created by the proceeds of the four checks here involved, were of a fiduciary character and were, in effect, equitably owned by unpaid subcontractors or materialmen, it had no legal right to obtain or retain such checks and to participate in a diversion of these funds by such retention, thereby acquiring an improper advantage and benefit to the detriment of plaintiff and other materialmen similarly situated. Such retention of the four checks and their *1041 proceeds made Talcott privy to Baker-Smith’s similar violation of the trust fund provisions of the Lien Law (Ward v. City Trust Co., 192 N. Y. 61, 69, 72-73; Squire v. Ordemann, 194 N. Y. 394; Bischoff v. Yorkville Bank, supra).
Talcott has cited the second paragraph of subdivision (7) of section 13 as authority for the proposition that it was relieved of any responsibility with respect to Baker-Smith’s application of borrowed moneys. Concededly, an assignee is released from such responsibility. However, the cited section relieves a lender of money from being charged in a criminal or civil action for the improvident conduct of the borrower only with respect to the specific moneys advanced by said lender. Contrary to Talcott’s contention, this is not the same as permitting a lender to escape the liability imposed by section 36-b with respect to trust funds which it knowingly receives from the borrower in repayment of its advances. The mere fact that Talcott loaned moneys to Baker-Smith, therefore, is not sufficient here to free it from the duties, obligations and liability imposed by section 36-b.
It is to be noted that amendments to the trust fund provisions of the Lien Law made by the Legislature in 1959 (art. 3-A; L. 1959, ch. 696, eff. Sept. 1, 1959), although not controlling here, shed light on the applicable prior law which governs this action. The new law, for the first time, specifically permits an assignee, by way of affirmative defense only, to claim as a credit the amount of .moneys advanced and actually applied to the payment of job claimants, provided the lender itself has complied with the applicable filing provisions of this law. In the instant action, however, Talcott failed to prove that any of the moneys it advanced to Baker-Smith were actually used by the latter to pay such claims and, furthermore, even if- it were so shown, the record adduced upon the trial does not prove that defendant ever filed any of the Baker-Smith assignments.
Talcott has relied heavily upon the case of Raymond Concrete Pile Co. v. Federation Bank & Trust Co. (288 N. Y. 452) in its attempt to avoid liability here. In the opinion of the court, this case is not.applicable. In the Raymond case, a nonlien creditor sued a bank in which the general contractor maintained an account and in which it had deposited the proceeds of a check received by it from the City of New York for work on the then new Criminal Courts Building. On February 17, 1939 (a Friday), the general contractor made a deposit in the defendant bank of approximately $178,000. The City of New York check cleared through the Clearing House on the same day of this deposit. On February 20,1939, the following Monday, the bank offset against the credit of the depositor’s account a note given *1042 by tbe general contractor on the preceding Friday when its account was overdrawn. It is significant that in the cited case the warrant and order from the city to the- contractor was indorsed and deposited by said contractor in the regular course of business, in his own account in defendant’s bank. Nothing like that occurred in the instant action. Under the terms of its factoring agreement and assignments of accounts receivable, Baker-Smith was compelled by defendant to deliver the original checks and, in effect, the entire proceeds thereof to Talcott. Thus, Talcott exercised a colorable, although unlawful, priority over materialmen and others who made possible the improvement at Roosevelt Hospital and for whose protection the provisions of the Lien Law were intended.
Likewise, in the Raymond case, as opposed to the instant action, the contractor’s borrowings were from a bank and were evidenced by notes of which the proceeds “ were deposited in the contractor’s account and used by the contractor for the purposes of the contract ” {supra, p. 456). There is no proof in the record before this court that the proceeds of any of the moneys received by Baker-Smith were used to pay any job claimants or for any other contractual purpose.
Moreover, it should be noted that the Raymond case was decided prior to the 1942 amendments to the Lien Law. The then applicable Lien Law did not contain the provision, as it now does, that trust funds included “ moneys actually received by ” a subcontractor, nor the civil remedy now available to obtain payment therefrom. Thus, under the law applicable to the instant action, unlike that in existence at the time of the 1939 offset in the Raymond case, once funds are received by a subcontractor, the same immediately become trust funds for the benefit of the designated class (see 1942 Report of N. Y. Law Rev. Comm., p. 325 et seq.).
Contrary to Talcott’s contention, therefore, if section 36-b is to serve any useful purpose and if the obvious legislative intent subsequent to the Raymond case is not to be completely emasculated, such law must be construed to mean that once Baker-Smith received the four checks here involved, they then became trust funds until all claims for services and materials were paid, regardless of its then undisclosed financing arrangement with Talcott. The court cannot disregard the fact that Talcott failed to avail itself of whatever degree of protection it was afforded by subdivision (5) of section 13 and section 15 of the Lien Law. To permit Talcott now to prevail over the beneficiaries of the trust funds and the designated favored class set forth in section 36-b, in effect, would reward its omissions and noncompliance *1043 with the law with preferment beyond that accorded plaintiff and other claimants for full compliance with the statute. This, in the opinion of the court, would be inequitable and not justified by the facts in this action.
The case of Shore Bridge Corp. v. Utica Structural Steel (268 App. Div. 714, aff. 295 N. Y. 619), cited by Talcott in support of its position that the assignments from Baker-Smith gave it a priority over plaintiff with respect to the Tishman funds, in no way aids Talcott’s position in the instant action. The cited case involved the foreclosure of a lien and assignments “ duly drawn and filed as required by the statute ” (p. 715) and was based upon facts in existence prior to the adoption of the 1942 amendments to the Lien Law which, as heretofore noted, expressly provided a civil remedy for its enforcement and dispensed with the necessity of job claimants such as plaintiff to file a lien for trust fund purposes. The case merely restated the possible priority afforded by the then existing law to a duly drawn and filed assignment over a lien subsequently filed in a foreclosure proceeding. None of these facts are relevant to the case before this court. In view of Talcott’s actual as well as constructive notice of the nature of the funds received by Baker-Smith from Tishman, the court would not be warranted at this time to permit this defendant to escape the liability imposed upon it by the Lien Law merely because it had advanced moneys as a lender and now seeks to retain same as repayment in derogation of plaintiff’s statutory rights to these funds.
Talcott has asserted that no trust for plaintiff’s benefit could have come into existence before July 7, 1955, the date of plaintiff’s first invoice to Baker-Smith. In support of this contention, it has cited Gramatan-Sullivan v. Koslow (240 F. 2d 523). This case has been criticized in the 1959 Report of the Law Revision Commission (N. Y. Legis. Doc. No. 65 [F], p. 1, supra) as being in conflict with the intent and purposes of the New York lien laws. In any event, the cited case is inapplicable here. The subcontractor in the Gramatan case had neither made nor contracted for any deliveries to the contractor as of the date of payments to the defendant therein. In the instant action, however, plaintiff had an executed contract dated October 24, 1954, with Baker-Smith before any of the funds here involved were turned over to Talcott.
At the conclusion of the trial, Talcott, as part of its motion to dismiss the complaint, asserted that plaintiff failed to prove its status as an unpaid materialman and, therefore, had no right to bring this action. The credible testimony and docu *1044 mentary evidence fail to sustain such contention. It is to be noted that part of plaintiff’s proof which supports its claim as an unpaid materialman was adduced from the testimony of Baker-Smith’s own treasurer, one Morton. This witness acknowledged the delivery and installation of plaintiff’s materials at Roosevelt Hospital as well as nonpayment therefor. In the opinion of the court, the record amply establishes plaintiff’s right to maintain this action as an unpaid materialman.
Judgment is rendered accordingly in favor of plaintiff as prayed for in its complaint, with costs. The application for a counsel fee is denied.
Submit decree within three days on two days ’ notice.
The above constitutes the decision of the court as required by the applicable provisions of the Civil Practice Act.