AMOCO OIL COMPANY, a Maryland corporation, Plaintiff-Appellant and Cross-Respondent,

v.

CAPITOL INDEMNITY CORPORATION, Defendant-Respondent and Cross-Appellant and Cross-Respondent,
Staley & Lawrenz, Inc., Defendant-Respondent,
Black Rock Contracting Corporation, Craig D. Lawrenz, Defendants,
John R. Madden, Defendant-Respondent and Cross-Appellant.

Court of Appeals

*No. 77–773. Argued April 24, 1979.—Decided January 28, 1980.*
(Also reported in 291 N.W.2d 883.)

For the plaintiff-appellant Amoco Oil Company, there were briefs by *Ronald L. Wallenfang* and *W. Stuart Parsons* and *Quarles & Brady* of Milwaukee, and oral argument by *Ronald L. Wallenfang*.

For the defendant-respondent Capitol Indemnity Corporation there were briefs by *Bruce Gillman* and *Tomlinson, Gillman & Travers, S.C.,* of Madison, and oral argument by *Bruce Gillman*.

For the defendant-respondent and cross-appellant John R. Madden there were briefs by *Thomas J. Basting* and *Brennan, Steil, Ryan, Basting and MacDougall, S.C.,* of Janesville, and oral argument by *Thomas J. Basting*.

Before Bablitch, J., Dykman, J. and Sachtjen, Reserve Judge.

SACHTJEN, W.J. This is a contract action commenced by the plaintiff (Amoco) to recover the balance due it for

1,067.47 tons of hot asphalt delivered to the defendant-contractors for purposes of a state highway project. Only 693.4 tons were actually used on this project. The remaining asphalt was diverted to two other public projects and numerous private ones. The contract obligated Amoco to provide only up to 740 tons for the specified state highway project. The essence of this dispute is who is liable for payment of the asphalt delivered but not actually used for the project specified in the contract.

The defendants consist of the contractor who agreed to purchase the asphalt (Staley & Lawrenz, Inc.), its surety on the Wisconsin state highway project (Capitol Indemnity Corp.), a subcontractor on the Wisconsin project (Black Rock Contracting Corp.), and the subcontractor's individual officers (Craig Lawrenz and John Madden).

In June of 1975, Amoco and Staley & Lawrenz entered into an agreement under which Amoco agreed to supply up to 740 tons of asphalt to be used for the paving of Wisconsin State Highway 11 near Orfordville. The contract amount was based on an estimate made by a trained Amoco asphalt sales engineer of the quantity of asphalt needed for the project. The contract specified that the asphalt was to be used for project 1701–5–71, the Highway 11 paving job.

Staley & Lawrenz was awarded the bid for project 1701–5–71 in the spring of 1975. It had never before worked on an asphalt blacktopping project but one of its officers, Craig Lawrenz, had discussed forming a contracting corporation that did such work with John Madden prior to the submission of the bid. Lawrenz and Madden had not incorporated this separate corporation, to be known as Black Rock Contracting Corp. (Black Rock), at the time of the bid.

Staley & Lawrenz submitted the bid with the intent to sublet the entire project to Black Rock as soon as it was incorporated. On April 28, 1975, Madden and Lawrenz, as individuals, signed an indemnity agreement under which they assumed personal liability for any losses arising out of the Orfordville project on the part of Staley & Lawrenz.

After Black Rock was incorporated on May 14, 1975, Staley & Lawrenz learned that, under the terms of the state contract it could not subcontract the entire job as planned. Consequently it sublet two-thirds of the project to Black Rock and the R. T. Madden Company, Inc. Staley & Lawrenz agreed to assume liability for the remaining third, which consisted of the cost of purchasing the liquid asphalt for the job.

As required by sec. 289.14(1), Stats., which provides that a prime contractor must furnish a performance bond in order to obtain a public works contract, Staley & Lawrenz obtained such a bond in the amount of $178,848 from Capitol on May 3, 1975. The bond contract provided:

The condition of this obligation is such that if the said bounden principal shall in all things perform all the terms and conditions of the within and foregoing contract and applicable specifications, to be by such principal performed, and shall make all payments as therein required, then this obligation is void; otherwise it shall be and remain in full force and virtue.

Staley & Lawrenz hired Indianhead Truck Line Inc. (Indianhead) to haul the asphalt from the Amoco refinery in Whiting, Indiana, to a central batch plant then owned and operated by Black Rock near Orfordville. Forty-three truckloads of asphalt were delivered between July 29, 1975 and November 17, 1975. Each delivery was initiated by Charles Meyers, superintendent of the Black Rock plant. Meyers placed orders for the asphalt through

Indianhead, which then made shipping arrangements with Amoco. All bills of lading for the shipments of asphalt specifically refer to the Orfordville Highway 11 project.

Undisputed records of Staley & Lawrenz show that of the 1,067.47 tons of asphalt delivered, the Orfordville project consumed only 693.4 tons. A public works project in South Beloit, Illinois, used 192 tons of the asphalt while 51.86 tons were used on a Village of Albany public works job and the remaining 130.21 tons were dispersed among various private jobs.[1] The South Beloit public works project was also bonded by Capitol pursuant to Ill. Rev. Stats. ch. 29, sec. 15.

Amoco claims that it first learned of the discrepancy between the amount it delivered and the amount actually used in the Orfordville project in a January 15, 1976 letter from Capitol.[2] Prior to that time, Amoco kept track of the amount of asphalt shipped to each customer during the preceding week by means of a weekly "lifting"

---

[1] Amoco does not seek to recover payment for the 51.86 tons of asphalt used on the Village of Albany project because that project was bonded by another surety, American Fidelity, which settled with Amoco for the amount due.

There is no evidence that the private jobs which used Amoco asphalt purchased by Staley & Lawrenz were bonded.

[2] The letter to Amoco from Capitol provided in pertinent part:

Confirming our telephone conversation of today's date, the Capitol Indemnity Corp. sees three distinct and separate problems in your potential claim against the bond of Staley and Lawrenz, Inc. on the Rock County Project 1701-5-71. The sales agreement entered into on June 16, 1974 between Mr. Kinnard and Mr. Craig Lawrenz calls for delivery of paving asphalt, F.O.B. Whiting, Indiana, in the amount of (173,900 gallons) 740 tons. The State run that we have shows that 650 tons have been approved to date although Mr. Lawrenz hopes to get that figure up to around 700 before final acceptance. The figure that has been indicated to Capitol due on that project of 249,445 gal. is simply not possible.

report. This report did not, however, list the estimated requirements for each job for which asphalt was supplied. Consequently, there was no way of determining from these reports whether a given customer's orders were exceeding its predetermined needs.

Lawrence Kennard, Amoco's asphalt sales engineer for Wisconsin at the time the contract was made, was transferred and replaced by Donald G. Collins in early September, 1975. Kennard testified that he never personally spoke with Lawrenz about any overrun of asphalt; that the normal deviation between estimated and actual asphalt usage was between zero and ten percent if there were no construction change orders; that he did not know why he neither noticed nor questioned any excess shipment of asphalt which would have indicated a diversion; and that the normal Amoco practice was to have a specific sales agreement for a specific state highway project.

Collins testified that he first noticed Staley & Lawrenz from an Amoco credit report which showed that the contracting firm was behind in its payments. As of August 31, 1975, it owed $50,507 to Amoco. Collins said that Kennard never told him of any potential diversion problem with Staley & Lawrenz before he left. Collins attempted to contact Lawrenz about the overdue bill in late September, 1975, but was unsuccessful. Staley & Lawrenz paid Amoco $27,551.21 on September 3, 1975, but Amoco's credit report for September showed that it still owed $45,006 to Amoco.

Amoco claims that it first learned of the use of its asphalt in the South Beloit project in April, 1976, when it received a letter from a Beloit engineering firm informing it of the performance bond executed by Capitol for the South Beloit project. It promptly made a claim against Capitol, under both the Orfordville and South Beloit job bonds for all the asphalt provided for both the Orfordville and South Beloit projects.

Capitol refused this claim but did attempt to negotiate a settlement with Amoco in March, 1976, for the principal sum due for the asphalt used on the Orfordville project under the Orfordville bond. The settlement offer was rejected.

Amoco brought a collection action on December 7, 1976, to recover the price for all asphalt furnished to Staley & Lawrenz. It named Capitol, Staley & Lawrenz, Black Rock, Craig D. Lawrenz, John R. Madden and Charles H. Meyers as defendants. Meyers, who placed the asphalt orders on behalf of Black Rock, was later dismissed by consent of the parties as a defendant. Capitol cross-complained against Lawrenz and Madden on the basis of the April 28, 1975 indemnity agreement they entered into to save Staley & Lawrenz harmless from any loss arising out of the Orfordville project. Capitol sought to recover, under a subrogation theory, any judgment it would have to pay Amoco for the balance due for the asphalt used in the Orfordville project.

A trial to the court was held in the Rock County Court on October 3, 1977. On February 27, 1978, the trial court entered a written decision determining that Amoco could recover a judgment against Capitol only for the unpaid price of the asphalt actually used on the Orfordville project in the amount of $22,928.21, together with interest and costs in the amount of $2,408.99; that Amoco could not recover from Capitol for any of the asphalt diverted to other work, including the South Beloit project; and that Capitol could recover from Madden for the amount of its loss to Amoco under the April 28, 1975 indemnity agreement signed by Lawrenz and Madden. The trial court dismissed Amoco's cause of action against Madden and Black Rock.

Amoco appeals from that portion of the judgment entered on April 11, 1978, which refused its recovery against Capitol for the price of the asphalt diverted from the Orfordville project. Capitol cross-appeals from the

award of prejudgment interest on the amount awarded for the nondiverted asphalt. Madden appeals from that part of the judgment granting Capitol's cross-claim.

Each party's appeal raises several distinct issues. We will first discuss those issues peculiar to the Amoco appeal and then subsequently address those of Capitol and Madden.

### Amoco's Claim for the Diverted Asphalt

The trial court held that materials furnished by a supplier for a public works project covered by sec. 289.14, Stats., must actually be used for that project before a surety is liable for payment of those materials. Amoco contends that actual use is not an absolute precondition to its liability.

Capitol claims that the trial court's holding is supported by the terms of sec. 289.14(1), Stats., which requires state contractors to obtain a bond "for the payment by the prime contractor of all claims for labor performed and materials furnished, *used or consumed* in making the public improvement or performing the public work." (Emphasis supplied.) Capitol claims that an actual use requirement under sec. 289.14 is supported by language in *Peabody Seating Co. v. Jim Cullen, Inc.,* 56 Wis.2d 119, 127, 201 N.W.2d 546, 551 (1972). There the supreme court said, in ruling on the claim of a materials supplier for a public high school, that "[i]t is not enough that a supplier demonstrate that he furnished materials; it *must also be established that the materials were in fact used on the construction project.*" (Emphasis supplied.)

Amoco contends that the situation of a materials supplier for public works projects who seeks recovery from a surety under sec. 289.14, Stats., is like that of a materials supplier who seeks to assert a mechanic's lien against a privately constructed project. The Wisconsin

Supreme Court has held that a supplier need only establish that it delivered material to the building's owner or agent, "either upon the premises or otherwise, for use upon or in a particular project . . . to sustain the mechanic's lien." *Builders Lumber Co. v. Stuart*, 6 Wis.2d 356, 364, 94 N.W.2d 630, 634 (1959) ; *Kilgust Heating v. Kemp*, 70 Wis.2d 544, 548, 235 N.W.2d 292, 294 (1975).

We hold that the trial court erred in concluding that a supplier must establish that the materials furnished were in fact used on the construction project for which they were ordered before recovering from a surety. The predecessors to sec. 289.14, Stats.,[3] were enacted to "extend to contractors, laborers, and materialmen on a public work protection comparable to that given by the Mechanic's Lien Law on private construction." *Knuth v. Fidelity & Casualty Co.*, 275 Wis. 603, 608, 83 N.W.2d 126, 129 (1957). Public property is not subject to mechanic's liens, so performance bonds were required for the protection of those involved in the public construction. This was limited to that given by the mechanic's lien statute at the time of the initial enactment of the surety bond statute by ch. 292, Laws of 1899. *Gilson Bros. Co. v. Worden-Allen Co.*, 220 Wis. 347, 352–53, 265 N.W. 217 (1936).

Early Wisconsin case law provided protection under the lien laws for suppliers who delivered goods under the control of the contractor. *Neumann v. Strandt*, 195 Wis. 610, 613, 219 N.W. 348 (1928) ; *Esslinger v. Huebner*, 22 Wis. 632, 634 (1868).

The Wisconsin Supreme Court clarified its longheld position in 1959 in *Builder's Lumber Co., supra* at 364,

---

[3] Present sec. 289.14, Stats., was renumbered from sec. 289.16, by ch. 351, Laws of 1967. Section 289.16 dates back to 1899, ch. 292, Laws of 1899.

94 N.W.2d at 634, holding that delivery of goods by a supplier is sufficient to sustain a mechanic's lien.

We are satisfied that this longstanding protection under the Mechanic's Lien Law can be found to afford coextensive protection to those under the bonding statutes. The *Peabody* case does not compel a different result. In *Peabody,* the court did not construe sec. 289.14 (1), Stats., (then numbered 289.16(1)) because it did not apply to the claimant, a supplier to a subcontractor of seats for a public high school auditorium. Its statement that actual use of materials must be proven was made in the context of determining whether the supplier had given notice of its claim within ninety days after it had "furnished the last of the materials" as provided by the bond.[4] *Peabody,* 56 Wis.2d at 126–27, 201 N.W.2d at 550.

The statement does not support Capitol's contention that the statute requires actual use of materials supplied for a public work as a condition precedent to a surety's liability.

The Miller Act, 40 U.S.C. secs. 270a *et. seq.,* is the federal counterpart to sec. 289.14, Stats. Its purpose, like

[4] *See, e.g. Boyd Callan, Inc. v. United States,* 328 F.2d 505 (5th Cir. 1964); *United States v. Woods Construction Company,* 224 F. Supp. 406 (D.C. Okla. 1963); *United States v. George A. Fuller Co.,* 250 F. Supp. 649 (D. Mont. 1965).

State courts are split over whether actual incorporation of building materials must be proved in order to support a lien. *See, e.g. Kobayashi v. Meehleis Steel Co.,* 28 Colo. App. 327, 472 P.2d 724 (1970); *American Blower Corporation v. James Talcott, Inc.,* 18 Misc.2d 1031, 194 N.Y.S.2d 630 (1959). *Cf. Tennessee-Arkansas Gravel Co. v. Harvey & Jones,* 147 So. 739 (La. App. 1933); *Colonial Oil Co. v. United States Guaranty Co.,* 56 F. Supp. 545 (S.D. Ga. 1944), *aff'd* 145 F.2d 496 (1944); *Manhattan Terrazzo Brass Strip Co. v. A. Benzing & Sons,* 72 Ohio App. 116, 50 N.E.2d 570 (1943).

*See also* Annot. 39 A.L.R.2d 394 (1955); Note, 1960 Wis. L. Rev. 350.

that of the Wisconsin statute, is to protect those who provide labor and materials on federal public works in the same manner in which mechanic's liens granted under state laws protect persons who work on private property. *United States v. Maryland Casualty Co.,* 316 F. Supp. 750 (E.D. Cal. 1970).

Federal courts have found:

It is fundamental that in order for a materialman to recover under the Act it is necessary only that he show that the materials were supplied in prosecution of the work provided for in the contract, that he has not been paid therefor, *that in good faith he had reason to believe the materials were intended for the specified work,* and that he complied with the jurisdictional requisites. It is immaterial to his right of recovery that the materialman deliver the materials to the jobsite or that such materials actually be used in the prosecution of the work. . . . *Nor is diversion of materials a valid defense if the supplier has acted in good faith.* (Citations omitted.) (Emphasis added.) *United States, Use & Benefit Carlson v. Continental Casualty Co.,* 414 F.2d 431, 433 (5th Cir. 1969).

*See also: St. Paul-Mercury Indemnity Co. v. United States,* 238 F.2d 917 (10th Cir. 1956) ; *United States v. Endebrock-White Co.,* 275 F.2d 57 (4th Cir. 1960).

We find the reasoning of the foregoing cases persuasive. Neither the public nor the supplier benefits from a construction of the statute which affords less protection to suppliers of public projects than that afforded under the materialman's lien statute to suppliers of private projects. Such construction could well affect the willingness of materialmen to supply public projects and the price charged for doing so. A "good faith" requirement accommodates the public interest as well as the supplier's interests in a situation such as this. The question remains whether Amoco's delivery of considerably more asphalt than that required or used by the Orfordville project was in "good faith."

## Amoco's Good Faith Delivery

The existence or nonexistence of good faith as an issue is usually determined by the trier of fact. *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 10, 231 N.W. 257 (1931) ; 75 Am. Jur.2d *Trial* sec. 372 (1974).

Findings of such fact will not be upset on appeal unless contrary "to the great weight and clear preponderance of the evidence." *Clintonville Community Hosp. v. Clintonville*, 87 Wis.2d 635, 639, 275 N.W.2d 655, 657 (1979). Furthermore, our appellate standard of review in cases such as this is "heavily weighted on the side of sustaining trial court findings of fact in cases tried without a jury." *Peabody*, 56 Wis.2d at 128, 201 N.W.2d at 551.

Amoco contends that its oversupply of the Orfordville project was merely negligent and that its negligence cannot be equated with "bad faith." It relies on *Baker v. Northwestern Nat. Casualty Co.*, 26 Wis.2d 306, 316, 132 N.W.2d 493, 499 (1965), which held that "bad faith" is a "species of fraud."

We agree that Amoco's actions do not constitute acts of "bad faith" as defined in *Baker*. However, we cannot conclude that mere absence of "bad faith" compels a finding of "good faith," which can be defined in numerous ways. In *United States v. Woods Construction Company*, 224 F. Supp. 406, 409 (N.D. Okla. 1963), for instance, the court defined "good faith" delivery under the federal Miller Act to mean that the supplier had "a reasonable and good faith expectation . . . at the time of delivery that the materials under all the circumstances would be substantially used up in the project."

In *Gruschus v. C. R. Davis Contracting Company*, 75 N.M. 649, 409 P.2d 500 (1965), the Supreme Court of New Mexico held that a contractor's agreement to furnish the necessary sand and concrete to a subcontractor for

the paving of a state highway was a "requirement contract" within the meaning of sec. 2–306(1) of the Uniform Commercial Code. That section is identical to sec. 402.306(1), Stats., which provides that materials may be delivered in good faith "except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded." The *Gruschus* court remanded the case for specific findings concerning the amount of materials actually used by the subcontractor and the proportion of any excess in supplies to the subcontractor's normal requirements.

Given these commercial definitions of "good faith" we cannot conclude that the trial court's finding is against the great weight and clear preponderance of the evidence. The record demonstrates that Amoco generally dealt in requirements contracts for specific projects; that it knew or could reasonably estimate the asphalt needs of its customers; that it received weekly reports that indicated the flow of asphalt to a given customer and monthly reports that warned of unpaid balances; that Amoco's agent never checked with Staley & Lawrenz about the burgeoning overrun, even though he testified that it would not have been unusual for him to do so; that the deviation between estimates and deliveries under requirements contracts might reach five to ten percent in a normal situation, and could go as high as twenty percent; that the excess supplied in this case reached approximately thirty-five percent; that the new Amoco agent who took responsibility for overseeing the shipments after the maximum contractual limit had been reached was not warned of any possible overrun or diversion and did not investigate such a possibility, despite the payment problem with Staley & Lawrenz; and that

total shipments as of September 11, 1975, when the new agent took over, were 816.39 tons, more than ten percent over the contract limit. Under these circumstances Amoco's negligence can only be viewed as considerable. The trial court correctly concluded that Amoco acted at its peril in continuing the deliveries over the amount contracted for, and that it cannot reasonably assume a "good faith" posture in doing so.

We recognize the difficulties inherent in policing the flow of goods under a requirements contract such as the one at issue. However, excess shipments which as in this case are well beyond those reasonably expected could be avoided by minimal diligence. The 740-ton limit in the present contract clearly demonstrates an intended limit on the elasticity of this customer's asphalt needs. A supplier cannot blindly supply virtually limitless amounts of its product, and then expect to recover the cost of a vast overrun from a surety whose bond is intended to bear some relationship to the known limits of the project. "Good faith" goes only so far. At some point negligence in failing to recognize what is plainly obvious prevents a materials supplier from claiming a good faith performance of its agreement.

We disagree, however, with the trial court's determination that Amoco can recover only for the 693 tons actually used on the Orfordville project. Amoco's negligence in failing to police the flow of its asphalt could only commence when the amount delivered exceeded the contract amount of 740 tons. Furthermore, it would be inequitable to hold Capitol to an amount less than it contracted for in the surety bond. Accordingly, we affirm the trial court's decision denying Amoco full recovery but modify it to allow Amoco to recover for the full contract amount of 740 tons.

*Amoco's Recovery Under the South Beloit Bond*

Amoco alternately seeks to recover for the asphalt diverted to South Beloit under the terms of the South Beloit bond. This bond provided:

NOW THEREFORE, the conditions of the above obligation is such, that if the above bounden principal shall well and truly keep, do and perform, each and every, all and singular, the matters and things in said contract set forth as specified to be the said principal kept, done and performed at the time and in the manner in said Contract specified, and shall pay over, make good and reimburse to the above named Owners, [the City of South Beloit, Illinois], all loss and damage which said Owners may sustain by reason of failure or default on the part of the said principal, then this obligation shall be void; otherwise, to be and remain in full force and effect.

We cannot accept Amoco's contention that the terms of this bond, which on its face protects only the City of South Beloit, create a right in a materials supplier to recover against the surety. The bond was given pursuant to the requirements of Ill. Rev. Stats. ch. 29, sec. 15. Illinois courts have held that a cause of action by a materials supplier against the surety of such bonds is a purely statutory, and not a common-law, creation. *City of DeKalb v. Sornsin,* 46 Ill. App.2d 161, 196 N.E.2d 502 (1964), *rev'd. on other grounds* 32 Ill.2d 284, 205 N.E.2d 254 (1965) ; *Board of Education, Etc. v. Pacific Nat. Fire Ins. Co.,* 19 Ill. App.2d 290, 153 N.E.2d 498 (1958). Consequently Amoco's right to recover on this bond is dependent upon its compliance with the requirements of the Illinois statutes.

Section 16 of ch. 29, Ill. Rev. Stats., provides that materials suppliers may sue in the name of the state or political subdivision covered by the bond, but that such suits "shall be brought only in the circuit court of this

State in the judicial district in which the contract is to be performed." Amoco contends that its claim in this case is "transitory" and not "local," and that Wisconsin courts have jurisdiction over this statutory cause of action despite the jurisdictional restriction set forth in the statute. We reject this contention.

The Illinois statute differs significantly from Wisconsin's sec. 289.14(2), Stats., which allows any party injured by a prime contractor of a public works project to file suit in any court within a year of completion of work. This statute assumes a transitory cause of action. *See* Annot. 85 A.L.R. 847 (1933). By contrast, the Illinois statute does not create a general contractual obligation under a bond. It provides a specific remedy to suppliers which is conditioned upon strict compliance with procedural requirements. Such compliance is jurisdictional. *United City of Vil. of Yorkville v. W. J. Lewis Const. Co.*, 48 Ill. App.2d 463, 198 N.E.2d 863 (1964) ; *City of DeKalb v. Sornsin*, 46 Ill. App. 161; *Board of Education, Etc. v. Pacific Nat. Fire Ins. Co.*, 19 Ill. App.2d 290. Such statutes are enforceable only in the jurisdiction where enacted.

In *Commonwealth of Pennsylvania v. Beals*, 139 Misc. 785, 249 N.Y.S. 232 (1931), the New York court found that the cause of action on a public contractor's bond is local to Pennsylvania because the Pennsylvania statute provided for a specific remedy which could only be enforced in Pennsylvania courts. It said:

It seems that in the Pennsylvania statute we find that the bond is to have effect only in a particular way, and that it is to be enforced only in the particular mode pointed out by said statute. The enforcing of said bond is, therefore, within the exclusive province of the tribunals of the Commonwealth of Pennsylvania. 249 N.Y.S. at 237.

The New York court went on to find that the surety's obligation was local in nature, and that New York courts

consequently had no subject matter jurisdiction over the action. *Accòrd, Omega New York Products Corp. v. Parisi Bros., Inc.,* 57 Misc.2d 1000, 293 N.Y.S.2d 878 (1968).

We find the reasoning of the New York court persuasive. We consequently hold that a Wisconsin court has no subject matter jurisdiction over a suit brought under Ill. Rev. Stats. ch. 29, sec. 16. Since this holding forecloses Amoco's cause of action on the South Beloit bond, we need not address the issue of whether its notice of the claim complies with other procedural requirements of the Illinois statutes.

### Capitol's Cross-Appeal

Capitol cross-appeals from the trial court's award of prejudgment interest in the sum of $2,408.99. The question presented is whether Amoco is entitled to this amount in light of the fact that it rejected Capitol's offer to settle the claim for the principal cost of the materials actually used in the Orfordville project, which was the full amount to which it was subsequently found to be entitled.

Capitol contends that the court erred in awarding prejudgment interest. It argues that Amoco is not entitled to the same because it rejected Capitol's offer to settle the claim prior to suit for the principal amount due for the materials actually used in the Orfordville project, which was the full amount to which the trial court found it to be entitled. It asserts that Amoco never made demand for that amount, and that by rejecting the proposed settlement Amoco placed the amount of principal due in dispute. Capitol's claims are without merit.

It is well settled in Wisconsin that damages for breach of contract or for tort which are "liquidable or measur-

able in money with reasonable certainty" bear interest from the time of demand. *Necedah Mfg. Corp. v. Juneau County*, 206 Wis. 316, 334, 237 N.W. 277, 283, *reh.* 240 N.W. 405 (1932). It is true that prejudgment interest will be denied where the damage claim is "substantially inflated and a genuine dispute existed [exists] between the parties as to the amount due." *Wyandotte Chemicals Corp. v. Royal Electric Mfg.*, 66 Wis.2d 577, 586, 225 N.W.2d 648, 653 (1975). This is not the case because Capitol could easily ascertain the amount it would owe under the Orfordville contract with Amoco, despite the dispute over whether Capitol would owe Amoco more for the other projects. As the supreme court said in *Dahl v. Housing Authority of the City of Madison*, 54 Wis.2d 22, 30–31, 194 N.W.2d 618 (1972) :

" '. . . The true principle, which is based on the sense of justice in the business community and on our statute, is that he who retains money which he ought to pay to another should be charged interest upon it. The difficulty is that it cannot well be said one ought to pay money, unless he can ascertain how much he ought to pay with reasonable exactness. Mere difference of opinion as to amount is, however, no more a reason to excuse him from interest than difference of opinion whether he legally ought to pay at all, which has never been held an excuse. . . . So, if there be a reasonably certain standard of measurement by the correct application of which one can ascertain the amount he owes, he should equally be held responsible for making such application correctly and liable for interest if he does not. . . .' " [Citing *Laycock v. Parker*, 103 Wis. 161, 186, 79 N.W. 327, 335 (1899).]

Capitol never denied that it owed Amoco for the asphalt under the contract. Thus, there was a "recognized liquidable sum upon which prejudgment interest can be computed." *Fattore Co., Inc. v. Metropolitan Sewerage Com'n.*, 505 F.2d 1, 7 (7th Cir. 1974).

We find that the trial court properly awarded pre-judgment interest. Since we have held that Amoco is entitled to judgment for the entire amount of asphalt it contracted to provide, the amount of interest should be modified on remand to reflect the increase in interest due.

### *The Madden Indemnity Agreement*

The final issues on this appeal relate to the trial court's entry of judgment against John R. Madden in favor of Capitol due to the April 28, 1975 indemnity agreement signed by Madden and Craig D. Lawrenz. It provided:

We, the undersigned, hereby agree to sublet the Orford-ville-Footville Road, State Trunk Highway 11, State project no. 1701–5–71 in Rock County at the unit prices submitted under the proposal in the name of Staley & Lawrenz, Inc., to do all the work under the contract to the approval and acceptance of the State Highway Commission of Wisconsin, and save harmless Staley & Lawrenz, Inc., from any costs, claims, or damages.

Staley & Lawrenz, Inc., agree to sublet this project in its entirety at the unit prices submitted to the State Highway Commission.

At trial Capitol successfully sought recovery from Madden for its payment to Amoco as a subrogee of the rights of Staley & Lawrenz.

At trial Madden attempted to prove that this contract was to have been in effect only until Black Rock was incorporated and the work was sublet to that corporation as planned by Lawrenz and Madden. Madden testified during an offer of proof that on June 16, 1975, he and Lawrenz agreed to withdraw their earlier agreement. Madden also offered a letter allegedly written by him to Lawrenz on June 17, 1975, which confirms the alleged

rescission of the subcontract agreement.[5] The trial court rejected this evidence on the basis of the parol evidence rule, finding the terms of the contract to be unambiguous. It also rejected the testimony of Lawrenz, who denied the limited term of the initial agreement and any subsequent rescission.

On appeal Madden claims that the trial court should not have applied the parol evidence rule because the indemnity agreement is ambiguous; that the trial court erred in finding that the contract was not rescinded; and that the trial court should have found the subcontract agreement void under sec. 241.02, Stats., the Statute of Frauds, for want of consideration.

The parol evidence rule is a rule of substantive law and has been defined as follows:

When the parties to a contract embody their agreement in writing and intend the writing to be the final expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in the absence of fraud, duress or mutual mistake. *Fed. Deposit Ins. Corp. v. First Mortg. Investors,* 76 Wis.2d 151, 156, 250 N.W.2d 362, 365 (1977).

The threshold question to invocation of the parol evidence rule is "whether the parties intended the written agreement to be final and complete or 'integrated' or whether they intended any prior agreements to be part

[5] The relevant part of this letter to Craig Lawrenz from John Madden provides:

This letter will confirm our meeting in your office on 16 June 1975.

Now that we have formed the corporation, Black Rock Contracting, and it is operating, Staley & Lawrenz, Inc., has sublet the bituminous work to Black Contracting Corporation and the base course to R. T. Madden Co., Inc., on the above referenced project, it is mutually agreed that the agreement signed on 28 April 1975, is hereby null and void.

of their total agreement." *Fed. Deposit Ins. Corp.*, 76 Wis.2d at 157, 250 N.W.2d at 366.

This situation is one which demonstrates the difficulty of applying the parol evidence rule, which has been described as " 'a maze of conflicting tests, subrules and exceptions adversely affecting both the counseling of clients and the litigation process.' " *Fed. Deposit Ins. Corp.*, 76 Wis.2d at 156, 250 N.W.2d at 365.[6] The evidence sought to be introduced in this case could be viewed either as proof of a prior agreement meant to be part of the final agreement, as explanation of contract ambiguities, or as evidence which would vary the terms of the written document. The trial court chose the last view and we reluctantly concur.

It is the general rule that where a contract fails to specify a time of duration, "it may be inferred that the parties thereto intended the contract to run for a reasonable time . . . . What constitutes a 'reasonable time' . . . is usually an implication of fact . . . derivable from language used by parties considered in context of subject matter and attendant circumstances, in aid of apparent intention." 17A C.J.S. *Contracts* sec. 398 at 480 (1963). The Wisconsin Supreme Court has observed that "[n]ormally the words used by the contracting parties are the best indicators of their intention. Occasionally words not used are also instructive." *North Gate Corp. v. National Food Stores*, 30 Wis.2d 317, 323, 140 N.W.2d 744, 747 (1966).

It is the natural implication of the language of this contract, in which the parties simultaneously agreed to sublet a construction project and to indemnify the sublessee from damages, that the indemnification was to run

---

[6] Quoting from Sweet, *Contract Making and Parol Evidence: Diagnosis and Treatment of a Sick Rule,* 53 Corn. L. Rev. 1036 (1968).

for the duration of the project. Nothing in the language of the contract suggests that a shorter duration was intended by either party at the time it was executed. We think it unreasonable to suppose that if a shorter duration was intended the contract would have failed to so state, since it would have been in the interest of both Madden and Lawrenz to set forth such a limitation on their individual liabilities. We consequently conclude that the contract was not ambiguous on this point and that the trial court correctly excluded testimony which would serve, if admitted to " 'establish an understanding in variance with the terms of the written document.' " (Citations omitted.) *Production Credit Assoc. v. Rosner*, 78 Wis.2d 543, 549, 255 N.W.2d 79, 81 (1977).

The trial court erred, however, in excluding the proffered evidence concerning the claimed rescission of the contract on the basis of the parol evidence rule. "The 'parol evidence rule' has no application to agreements made subsequently to the execution of a written contract." 5A Corbin, *Contracts* sec. 1236 at 541 (1964). The proffered evidence was not offered to alter the express terms of the contract. Evidence of rescission destroys, rather than defines, an agreement. Madden was entitled to introduce it. *Home Savings Bank v. Gertenbach*, 270 Wis. 386, 71 N.W.2d 347 (1955) ; *ABC Outdoor Advt., Inc. v. Dolhun's Mar. Inc.*, 38 Wis.2d 457, 157 N.W.2d 680 (1968).

Nonetheless, we conclude that the trial court's error in this respect was harmless, since the admission of the evidence of rescission would not have changed the result. In asserting the defense of rescission, Madden was required to prove that event by a clear preponderance of the evidence. *Alexander Hamilton Institute v. Hart*, 180 Wis. 90, 192 N.W. 481 (1923). In its memorandum decision, the trial court indicated that "had I allowed evidence of a rescission of that agreement, I would have

found that the hold-harmless agreement was not rescinded by mutual agreement, oral or otherwise." The trial court was entitled to believe Lawrenz' testimony that no rescission took place, and to disbelieve Madden's evidence to the contrary. *Kleinstick v. Daleiden,* 71 Wis.2d 432, 238 N.W.2d 714 (1976). The trial court's statement in its decision is a clear indication of its assessment of the credibility of testimony, which we are in no position to second guess. We cannot conclude from a review of the improperly excluded evidence that the trial court's implicit finding that Madden did not meet his burden of proof is against the great weight and clear preponderance of that evidence. *Kohlenberg v. American Plumbing Supply Co.,* 82 Wis.2d 384, 393, 263 N.W.2d 496 (1978).

We also concur with the trial court's holding that the consideration for the indemnification agreement was properly recited in the contract. The consideration for the expressed promise of Lawrenz and Madden to personally hold Staley & Lawrenz, Inc. harmless was the promise of Staley & Lawrenz, to subcontract the work to Madden's contracting company. This exchange of promises was sufficient consideration for validating the contract. *Chudnow Const. Corp. v. Commercial Dist. Corp.,* 48 Wis.2d 653, 180 N.W.2d 697 (1970).

For the foregoing reasons the trial court's judgment is affirmed, except as modified by our determination that Amoco should recover for the contract amount of 740 tons of asphalt, together with interest on that amount.

*By the Court.*—Judgment modified, as modified affirmed, and remanded for proceedings consistent with this opinion.