**PENNEX ALUMINUM COMPANY, A DIVISION OF METAL EXCHANGE CORPORATION, Plaintiff,**

v.

**INTERNATIONAL FIDELITY INSURANCE COMPANY, Defendant/Third Party Plaintiff,**

v.

**AIR MASTER, INC., Third Party Defendant.**

Civ. A. No 1: CV–91–1669.

United States District Court, M.D. Pennsylvania.

April 9, 1993.

Charles E. Friedman, Harrisburg, PA, Alan J. Bozer, Albrecht, Maguire, Heffern & Gregg, Buffalo, NY, for plaintiff.

Timothy Andrew Hoy, Eckert, Seamans, Cherin & Mellott, James J. Kutz, Eckert, Seamans, Cherin & Mellott, Harrisburg, PA, for defendant and third party plaintiff.

E. Harris Baum, Zarwin & Baum, P.C., Philadelphia, PA, for third party defendant.

## MEMORANDUM

RAMBO, Chief Judge.

Before the court is Plaintiff's motion for summary judgment. Briefs have been filed and the motion is ripe for disposition.

### Background

This is an action to recover on two payment bonds. The bonds were issued by defendant International Fidelity Insurance Company ("IFIC") to benefit suppliers furnishing materials to third party defendant Air Master, Inc. ("Air Master") for improvements on two New York City Housing Authority ("NYCHA") public housing projects.

Plaintiff Pennex Aluminum Company ("Pennex") is in the business of manufacturing aluminum extrusions. (Complaint at ¶ 1; Defendant's brief in opposition at 2.) Air Master, now insolvent, at one time was in the business of manufacturing and installing windows. (Brief in opposition at 2.)

Defendant IFIC is a New Jersey corporation which is in the business of writing and issuing bonds to construction companies in connection with construction projects. (Brief in opposition at 2.) In July 1990, IFIC issued two payment bonds to cover window replacement work being done by third party defendant Air Master at Lattimer Gardens, Leavitt Street Houses and Twin Parks West housing projects in New York City (collectively, the "Housing Projects"). (Frank Tanzola Aff. at ¶ 3, Def.App. at 7; Copy of bonds attached to Plaintiff's motion, Ex. A & B.)[1] Such bonds are required of all contractors working on NYCHA projects. N.Y.State Fin.Law § 137, subd. 1 (Consol.1993).

In August 1990, Air Master began purchasing aluminum extrusions from Pennex.[2] (Deposition of Bettina Kapp ("B. Kapp Dep.") at 14–15, Def.App. at 54–55; Deposition of Harold Kapp ("H. Kapp Dep.") at 43, 57–58, Def.App. at 27, 30–31.) These extrusions were shipped by Pennex to Air Master's plant in Bensalem, Pennsylvania where they were incorporated into the windows manufactured by Air Master. (Dep. of Joseph Golec ("Golec Dep.") at 58, Def.App. at 77; H. Kapp Dep. at 26, Def.App. at 19.) Since August 1990, Air Master has purchased a substantial quantity of material from Pennex. Sometime after September 1991, Air Master became insolvent and was taken over by secured creditors. (Letter from E. Harris Baum, counsel for Air Master, to court, dated Dec. 21, 1992.) As of the filing of the instant suit, Air Master owed approximately $160,000 to Pennex for the purchased extrusions. (Complaint at ¶ 8; Brief in opposition at 10.)

Pennex received a judgment against Air Master in the amount of approximately $176,000 in the Court of Common Pleas of York County, Pennsylvania.[3] (Complaint at ¶ 9.) This judgment has been docketed in the Supreme Court for the State of New York, County of Erie. (Motion at 2, ¶ 3.) Pennex also asserted a mechanic's lien against funds retained by NYCHA that were owing to Air Master. (Def.App. at 78–81; Golec Dep. at 65–68.) Recently, Pennex advised the court that it has received $68,669.51 from NYCHA in satisfaction of that lien. (Letter from Chas. Friedman, counsel for Pennex, to court, dated Jan. 20, 1993.) Thus, any recovery Pennex obtains in this court will be reduced by that amount.

In a further effort to recover the funds owed it, Pennex demanded payment under the payment bonds. When IFIC refused to pay, Pennex filed the instant suit, seeking recovery under the payment bonds and un-

1. Because various parts of the same depositions are attached to different pleadings throughout the record, the court will refer to deposition citations both by deposition transcript page and the page of the exhibit or appendix at which the relevant portion of the transcript appears in the record. "Def.App." refers to the appendix submitted by defendant IFIC.

2. Aluminum extrusions are the various metal pieces used to make a window frame. (H. Kapp Dep. at 19–20, Def.App at 13–14.)

3. In its complaint, Pennex claimed it was entitled to approximately $176,000, the amount of the judgment entered against Air Master in the York County Court of Common Pleas. A significant portion of that amount represents a 24% finance charge. However, in its motion for summary judgment, Pennex has requested entry of judgment only in the amount of $160,003.23, plus interest and attorney's fees.

der New York State Finance Law § 137. Defendants filed a third party complaint against Air Master.

Pennex has moved for summary judgment, alleging that it is entitled to recover on the construction payment bonds. IFIC denies liability, asserting that the materials for which payment is sought were not incorporated into the covered projects. Air Master also opposes Pennex's motion, and has adopted IFIC's brief in opposition.

### Discussion

The standards for the award of summary judgment under Federal Rule of Civil Procedure 56 are well known. As the Third Circuit Court of Appeals recently capsulized:

> Summary judgment may be entered if "the pleadings, deposition[s], answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 [247], 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Equimark Comm. Finance Co. v. C.I.T. Financial Serv. Corp.*, 812 F.2d 141, 144 (3d Cir. 1987). If evidence is "merely colorable" or "not significantly probative" summary judgment may be granted. *Anderson* [477 U.S. at 249], 106 S.Ct. at 2511; *Equimark*, 812 F.2d at 144. Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574 [587], 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

*Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987). Once the moving party has shown that there is an absence of evidence to support the claims of the nonmoving party, the nonmoving party may not simply sit back and rest on the allegations in his complaint, but instead must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing

that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quotations omitted). The court will consider Plaintiff's motion under these standards.

### I. The Parties' Respective Claims

Pennex asserts that its claim falls squarely within the provisions of the subject bonds issued by IFIC. It claims that there is no genuine issue of material fact that (1) it furnished material for prosecution of the Housing Projects and (2) that those materials were incorporated into the project, or, in the alternative, if they were not incorporated into the project, the materials were diverted from the project without the knowledge or authorization of Pennex. In the event that the materials were thus diverted, Pennex claims that it is entitled to recover under the diversion doctrine as articulated in *Giant Portland Cement Company v. State*, 232 N.Y. 395, 134 N.E. 322 (1922), and its progeny. Pennex also claims it is entitled to statutory interest at 9% and attorney fees pursuant to N.Y.State Fin.Law § 137, subd. 4(c) and C.P.L.R. § 5004.

IFIC disputes that Pennex is entitled to recover under the bonds, disagreeing with Pennex on both factual and legal grounds. First, IFIC asserts that there are at least three genuine issues of material fact that preclude the entry of summary judgment in this case:

> (1) whether the material ordered by Air Master from Pennex was ordered specifically for use on the Housing Projects, (2) whether the extrusions Pennex sold to Air Master were used in the prosecution of the work on the Housing Projects, at or in the vicinity of the Housing Projects, and (3) against which bond is Pennex asserting its claim, and to what extent.

(Brief in opposition at 27.) Second, IFIC disputes a number of legal contentions made by Pennex: (1) the applicability of the *Giant* "diversion" exception to the instant case; (2) the immateriality of whether or not the subject material actually was used in the project; and (3) the placement of the burden of proof regarding why materials were incorporated in the Housing Projects on IFIC. Finally,

IFIC denies that it is liable for attorney fees even if it were found liable on the underlying claim.

## II. Recovery Under the Payment Bonds

■ To recover under a payment bond, normally a supplier must prove (1) that it sold materials to the principal; (2) that the materials it sold were used in the prosecution of the project covered by the bonds; and (3) that the supplier was not paid all sums rightfully due for materials supplied for the covered project. *See, e.g., American Surety Co. v. Wells Water Dist.*, 253 A.D. 19, 1 N.Y.S.2d 614 (App.Div.1938), *aff'd*, 280 N.Y. 528, 19 N.E.2d 926 (1939) (surety liable to all claimants furnishing labor or materials in connection with construction and whose claims are provable and unpaid).

In this case, the parties do not dispute that the first and third prongs are met. It is conceded that Air Master supplied Pennex with a significant quantity of aluminum extrusions and that Air Master owes Pennex approximately $160,000. (Brief in opposition at 5–7, 10.)

The difficult issue is the second prong. With respect to the bulk of the material, the parties and all individuals with knowledge of the relevant sequence of events concede that no one knows how much, if any, of the Pennex extrusions actually were used in the covered Housing Projects. (Memorandum in support, at 8–9; Brief in opposition at 9; H. Kapp Dep. at 54–55, Def.App. at 28–29; Hillig Dep. at 42, 43, Def.App. at 45–46; B. Kapp Dep. at 23–25, 27, Def.App. at 58–60, 62.)

However, there appears to be a significant distinction between two types of parts supplied by Pennex. Pennex supplied Air Master with both standard extrusions of a type manufactured by many suppliers, including Air Master's other suppliers, and specially fabricated extrusions that were specific to the New York City Housing Projects. The evidence regarding actual use of the material in the Housing Projects differs significantly for the two types of material.

### A. Specially Fabricated Parts

■ Pennex specifically designed and fabricated a number of extrusions for the Housing Projects. (H. Kapp Dep. at 28–29, Motion, Ex. J.) The parties did not brief the exact quantities and value of these specially fabricated pieces. However, the facts establish that these parts were used in the Housing Projects.

At his deposition, Harold Kapp, Chairman of the Air Master Board, testified as to the normal handling of specially fabricated materials:

> "[I]f it came to something we had ordered special, like something for a job, which was not the usual situation, well, that would sit in the yard until, you know, it was needed for that job."

(H. Kapp Dep. at 32, Def.App. at 23.) In contrast to standard materials, which might be interchanged from one job to the next,[4] the specialized materials, because of their job-specific nature, were used only for the particular project for which they were ordered. "[W]e couldn't take [a piece of specially manufactured extrusion] and put it into our line and use this for another job." (*Id.* at 37, Motion, Ex. J.)

The materials were specially ordered for the New York City Housing Projects because Air Master had never had a contract to supply such parts before.

> We never used those [specially fabricated] parts before.... Let's put it this way: New York City Housing basically uses the same parts. We had not—we had provided windows for contractors for New York City Housing. They got those parts from somebody else. This was a job where we had bid the job directly, so we were supplying them for the first time.

(H. Kapp Dep. at 28–29, Motion, Ex. J.) Air Master became insolvent shortly after completing its work for NYCHA. (*Id.* at 45.) Thus, because Air Master's work on the Housing Projects was completed and there is essentially no stock left at the Air Master plant, (*id.* at 46), there is no logical explanation for the use of the specially fabricated materials other than that they were used in

---

4. See discussion below.

the projects covered by the bonds in this suit.

Defendant presents no evidence to rebut this conclusion. Instead, IFIC merely asserts that "Pennex has not demonstrated that even those [specially manufactured] parts were used in the prosecution of the work on the Projects." (Brief in opposition at 24 n. 15.) This assertion directly follows IFIC's concession that Air Master's purchasing manager, James Hillig "testified that some of the extrusions were ordered specifically for the Housing Projects." (*Id.*) This mere denial is insufficient. Once the moving party has shown that there is an absence of evidence to support the claims of the nonmoving party, the nonmoving party "must designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

Therefore, with respect to the specially fabricated parts, there is no genuine issue of material fact that they were incorporated into the Housing Projects.[5]

### B. *Standard Extrusions*

Pennex also provided · Air Master with standard extrusions of the type used on many projects and made by many manufacturers. Apparently, the standard extrusions were the bulk of the material that Pennex supplied to Air Master. (H. Kapp Dep. at 39–40, Def.App. at 25–26; Hillig Dep. at 36–37, 43, Def.App. at 43–44, 46.) There is a substantial question as to whether these pieces actually were incorporated into the subject Housing Projects.

The Pennex materials supplied to Air Master were delivered to Air Master's Bensalem, Pennsylvania plant. (Golec Dep. at 58, Def. App. at 77.) None were shipped directly to the Housing Projects. (*Id.*) At the plant, the materials were stored outside the factory in a storage yard. In the yard, the Pennex materials were tagged with the appropriate Air Master part number and segregated according to that part number. (Hillig Dep. at 33; Def.App. at 40.) Similar parts manufactured by various suppliers received the same Air Master part number. (*Id.*) Parts manufactured by Pennex were commingled with the extrusions supplied by other extrusion manufacturers. (*Id.*) After delivery, Pennex materials were nearly indistinguishable from those manufactured by Air Master's other suppliers. (Hillig Dep. at 33–34.)

Further, when using standard extrusions in the manufacturing process, Air Master employees generally did not distinguish materials according to their manufacturer. When employees needed a particular type of extrusion for a project, they would fill out a requisition form specifying the necessary part number and use whatever was brought to them from the yard. (*Id.*) No one kept track of which manufacturer's standard extrusions were used on a particular project. (*Id.*)

Finally, once the extrusions are incorporated into windows and installed in the Housing Projects, it is nearly impossible to determine who manufactured them without tearing the window out. Peter Weeks, Pennex's president, walked through the projects and was unable to determine if the windows he examined actually were made using Pennex extrusions. (Weeks Dep. at 40, Def.App. at 91.)

Thus, there is a material issue of fact as to whether or not the standard extrusions supplied by Pennex actually were used in the projects. In fact, it is clear that, on the facts of this case, there is no reasonable basis for a factfinder to determine how much Pennex material actually was incorporated into the Housing Projects. Such a finding would be mere speculation. Thus, if Pennex is required to show actual use of the material in the project, it will not be able to recover for the standard extrusions.

### III. The "Diversion" Exception

Plaintiff argues, however, that it need not show that the material that it supplied actually was used in the project. Plaintiff

---

**5.** The court recognizes that the parties have not specified exactly which parts were specially manufactured for the Housing Projects. From the discussion of this issue in the briefs, it appears to the court that the designation of which parts were specially manufactured would be relatively uncontroversial. In any event, given this court's ultimate disposition of this matter, it appears that this classification will be unnecessary.

asserts that it should be allowed to recover under the "diversion" exception if it can show that the materials supplied were intended for use on the Housing Projects.

■ The "diversion" exception, a doctrine of New York Lien Law, first was articulated in *Giant Portland Cement Company v. State*, 232 N.Y. 395, 134 N.E. 322 (1922). The *Giant* court held that a supplier was not deprived of his lien when the goods he furnished for use on a project were diverted by the contractor to another use without the supplier's knowledge or consent. *Id.* 134 N.E. at 324. The court found that the purpose of the Lien Law was "to protect materialmen and laborers who furnish either materials or labor for purposes of construction ... [and] the statute is to be liberally construed to effect this purpose." *Id.* Therefore, the court held:

> When we construe the statute in light of this policy declared by the Legislature and the courts and with a view to its practical administration, it seems to us that a materialman who in good faith furnishes materials to a contractor with which to construct a building or to build a road should not be deprived of his right to a lien because the contractor without his knowledge or consent diverts the material to some other purpose.

*Id.* at 324. A supplier has "furnished" goods "when he has delivered them to the contractor in good faith for the purpose of being used in the improvement." *Id.* At that point, "their actual use is something beyond his power and within the control of the contractor." *Id.*

The court reasoned that if the proposed diversion exception were rejected:

> every materialman who had in good faith supplied materials and lost possession of them [would be] at the mercy of a dishonest contractor who was willing to divert them to some other purpose. At the very least such a materialman would be required as a matter of ordinary precaution to send an inspector with each lot of materials he furnished who should watch them until they had finally been placed in the improvement.

*Id.* This rule has been followed by New York courts in a number of subsequent lien cases. *See, e.g., In re Wade Lupe Constr. Co., Inc.*, 134 Misc.2d 738, 512 N.Y.S.2d 338 (Sup.Ct.1987); *P.T. & L. Constr. Co. v. Winnick*, 59 A.D.2d 368, 399 N.Y.S.2d 712 (1977).

Pennex asserts that the diversion exception previously applied to lien cases should be extended to allow recovery under the bonds in the instant case. Neither the New York Court of Appeals nor any inferior New York State Court of which this court is aware has addressed this precise question. This court believes, however, that if it were to address this issue, the New York Court of Appeals would find Plaintiff's argument persuasive.

In support of its argument, Pennex points to the case of *Chittenden Lumber Company v. Silverblatt & Lasker, Inc.*, 288 N.Y. 396, 43 N.E.2d 459 (1942). In *Chittenden*, the New York Court of Appeals stated that § 137 of the New York State Finance Law (the statute pursuant to which the instant bonds were issued) was meant as a supplement to the Lien Law in those instances in which there was an insufficient fund due the contractor against which the materialman could enforce his lien. *Id.* 43 N.E.2d at 462. According to the *Chittenden* court, § 137 was an "apparent effort [by the Legislature] to afford greater protection to laborers and materialmen on public improvement contracts with the State." *Id.* 43 N.E.2d at 460. Thus, "adherence to the letter [of the statute] will not be suffered to defeat the general purpose and manifest policy intended to be promoted." *Id.* 43 N.E.2d at 461 (internal quotations omitted). Therefore, the *Chittenden* court interpreted § 137 to allow subcontractors to recover under the bonds issued pursuant to the statute even though the lienable fund due the contractor had been depleted.

The very same purposes served by the diversion doctrine in the lien context are promoted when this doctrine is applied to in the bond context. *Chittenden* makes clear that the purpose of § 137 is to protect suppliers such as Pennex. *Id.* 43 N.E.2d at 460. The statute was designed to shift the risk that a contractor will not meet its obligations from a supplier to a compensated surety who is paid for assuming that type of risk.

*Giant* explains that a remedial statute protective of suppliers is "to be liberally construed to effect [its] purpose." 134 N.E. at 324. *Giant* discusses the pernicious effect of construing a remedial statute in the manner proposed by Defendant. To hold the diversion doctrine inapplicable to cases such as this would require a supplier to take the same type of extreme measures the *Giant* court found unacceptable. *Id.* (to protect its right to recover under a mechanic's lien, a supplier need not post a watchman with his supplies to protect against unauthorized diversion by a contractor).

Thus, construing § 137 to allow a supplier to recover for goods furnished for use in a covered project but diverted by the contractor or subcontractor without the knowledge or authorization of the supplier is consistent with past construction of § 137 and promotes the statute's purposes.[6]

## IV. The Diversion Exception Applied

■ A review of the relevant case law shows that, in order to recover under the diversion doctrine, a supplier must show that:

(1) it delivered materials to the contractor or subcontractor;

(2) its delivery was made in good faith;

(3) it understood and intended that the materials be used in the prosecution of the covered work;

(4) the contractor or subcontractor to whom it delivered the goods diverted them from use in the project; and

(5) the supplier did not have knowledge of or authorize the diversion.

*Giant,* 134 N.E. 322; *Wade Lupe,* 512 N.Y.S.2d 338; *P.T. & L. Construction,* 399 N.Y.S.2d 712.

In this case, there is no argument regarding the second and fifth prongs of the test. The fourth prong, the diversion requirement also is satisfied. Common sense dictates that this prong encompasses a situation such as this one where the actions of the contractor prevent the supplier from proving that the goods were used as the supplier asserts they were intended. IFIC does not contend that Pennex can not recover if the goods actually were incorporated in the Housing Projects. Under the diversion exception, a supplier also could recover if it could show that the materials were *not* incorporated into the project (provided, of course, it met the other prongs of the test). It would be anomalous to hold that a supplier could recover if it proved either that the goods were incorporated into a project or if it proved that they were not, but that it could not recover at all if it could not prove either proposition because of the actions of the bonded contractor.

Accordingly, two issues remain in dispute, one legal and one factual. First, the parties disagree over the meaning of the term "delivery" and the effect of the language of the bond on the term. Second, there is a factual issue as to the intended use of the materials.

### A. The Delivery Requirement—Site Delivery

■ First, IFIC asserts that the delivery requirement mandates actual delivery of the subject material to the site of the project. The New York Court of Appeals has never articulated such a requirement. Nor do the cases cited by IFIC mandate such a requirement. *In re Wade Lupe Construction Com-*

---

**6.** One argument against the application of the diversion doctrine is that it might result in a surety paying twice for the same project. This argument is not convincing. First, the possibility of double liability existed in the *Giant* case and, presumably, was taken into account by the New York Court of Appeals when it first articulated the doctrine. In that case, and in all diversion exception cases, the property theoretically could be subject to a lien both for the loss to the supplier whose goods were diverted and to the supplier whose goods end up in the project. Second, putting this risk on the surety is consis-

tent with the purpose of § 137. The purpose of the bond requirement is to shift the risk of loss from a defaulting or duplicitous contractor from a subcontractor or supplier to a party in business of assuming that risk, i.e. the compensated surety. The surety can factor this risk into the premiums charged for such bonds.

In any event, there is no danger of double payment in this case. As discussed below, no other party could make a claim that its materials actually were used in the project because it is not possible to identify the manufacturer of the materials actually incorporated into the project.

*pany,* 134 Misc.2d 738, 512 N.Y.S.2d 338, 339 (Sup.Ct.1987); *American Blower Corporation v. James Talcott, Inc.,* 18 Misc.2d 1031, 194 N.Y.S.2d 630 (Sup.Ct.1959), *aff'd,* 11 A.D.2d 654, 203 N.Y.S.2d 1018, *reh. and app. denied,* 11 A.D.2d 928, 206 N.Y.S.2d 533 (App.Div.1960), *aff'd,* 10 N.Y.2d 282, 219 N.Y.S.2d 263, 176 N.E.2d 833 (1961).

In *Wade Lupe,* the court noted that, in *Giant,* the New York Court of Appeals gave "no indication that the subject cement was ever delivered to the actual construction site or that the 'diversion' theory requires such delivery." 512 N.Y.S.2d at 339. The *Wade Lupe* court noted that there had been no delivery to the construction site in the case before it. However, that was not the ground on which it denied recovery to the plaintiff supplier. In *Wade Lupe,* the material supplied had not been expended and was not beyond the reach of the supplier. In fact, it was at a known location and could have been reclaimed by the supplier. This is a very different situation from that faced by this court.

*American Blower* also does not mandate such a site-delivery requirement. In *American Blower,* the defendants asserted that they were not liable to a supplier because the materials were not incorporated into the project. Addressing this defense, the court merely restated (somewhat imprecisely) the holding of *Giant:* "Delivery of the materials to the site of the improvement, even without proof of incorporation therein, would be sufficient to establish a valid lien in favor of a materialman." 194 N.Y.S.2d at 636. The court did not assert that delivery to the site was necessary, but, rather, that it would be sufficient to permit recovery under the diversion theory.

To construe the diversion exception to require actual delivery to the site of the project would eviscerate the statute at issue. It would result in large numbers of suppliers being excluded from the protections intended them under § 137. In this case, delivery to the site was not reasonable. Pennex necessarily delivered materials to the Air Master factory where they were incorporated into windows. To require that Pennex deliver the materials to the site of the project, rather

than the factory, would serve no purpose. On these facts, at least, the court concludes that delivery to the factory fulfills the delivery requirement.

**B.** *The Delivery Requirement—Conflicting Language in the Bond and Statute*

IFIC asserts that, in any event, the definition of delivery must take into account the language of the bonds at issue in the case. Specifically, IFIC asserts that, even if the statute and the diversion doctrine apply, they are trumped by the language of the bond where the language of the bond and the statute are not coextensive.

The subject bonds were issued under New York State Finance Law, which provides, in pertinent part:

Section 137. Bond to secure payment of certain claims arising from a public improvement; enforcement

1. In addition to other bond or bonds, if any, required by law for the completion of a work specified in a contract for the prosecution of a public improvement for the state of New York a municipal corporation, a public benefit corporation or a commission appointed pursuant to law, or in the absence of any such requirement, the comptroller may or the other appropriate official, respectively, shall nevertheless require prior to the approval of any such contract a bond guaranteeing prompt payment of moneys due to all persons furnishing labor or materials to the contractor or his subcontractors in the prosecution of the work provided for in such contract....

3. Every person who has furnished labor or material, to the contractor or to a subcontractor of the contractor, in the prosecution of the work provided for in the contract and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was performed or material was furnished by him for which the claim is made, shall have the right to sue on such payment bond in his own name for the amount, or the balance thereof, unpaid at

the time of commencement of the action. . . .

N.Y.State Fin.Law § 137.

While the statute, by its terms protects "[e]very person who has furnished ... material, to the contractor or to a subcontractor of the contractor, *in the prosecution of the work provided for in the contract*," the terms of the bond are more restrictive. The bond provides for payment of "all lawful claims," defined as "[m]aterials and supplies (whether incorporated in the structure or not) ... used or consumed by Principal or any other subcontractor *at or in the vicinity of the Project* in the prosecution of the Work under said Contract." (Complaint, Ex. B at 2 (emphasis added).)

▉ A common law bond is to be construed by the same rules which govern the interpretation of any other contract. *General Phoenix Corp. v. Cabot*, 300 N.Y. 87, 89 N.E.2d 238, 241 (1949). The language of a common law bond governs the nature of the relations between the surety and any claimants under the bond. *Davis Acoustical Corp. v. Hanover Ins. Co.*, 22 A.D.2d 843, 254 N.Y.S. 14, 16 (1964). ("It has long been the law that a surety's liability is to be strictly limited by the scope and meaning of its agreement.").

▉ However, this case involves the construction of a *statutory* bond. The scope of liability under a statutory bond must be interpreted in light of both the statute and the bond. *Bedini v. Hodges*, 238 A.D. 530, 532, 264 N.Y.S. 522 (1933); *Salvino Steel & Iron Works, Inc. v. Fletcher & Sons, Inc.*, 398 Pa.Super. 86, 580 A.2d 853, 856 (1990), *app. dismissed*, 529 Pa. 62, 601 A.2d 806 (1992). "[I]n construing a statutory bond, the intent [of the parties] is to be gleaned not alone from the bond itself, but that consideration must be given to the language of the statute and the purpose for which the bond is given." *Hurt v. Miceli Bros. Constr. Co.*, 80 N.Y.S.2d 798, 799 (City Ct.1948). Therefore, "[a] right of action regarding a surety bond given in pursuance of a statute is created by the bond and the statute under which it is given, and ... it must be enforced pursuant

to the terms of the statute and not otherwise." *Bedini*, 238 A.D. at 532, 264 N.Y.S. 522.

In *Triple Cities Construction Company v. Dan–Bar Contracting Company*, 285 A.D. 299, 136 N.Y.S.2d 459 (1954), *aff'd*, 309 N.Y. 665, 128 N.E.2d 318 (1955), the court held that "[i]nasmuch as the bond in suit was given pursuant to * * * statute, the statutory text is to be read into the instrument." *Id.* 136 N.Y.S.2d at 463 (citing *Graybar Elec. Co. v. New Amsterdam Casualty Co.*, 292 N.Y. 246, 54 N.E.2d 811, 813 (1944)). It found that the statutory provisions were operative by force of the statute: "It was contemplated that, once a bond had been given in [the] form pursuant to the statute, the statute would attach and would prescribe the limitations and restrictions governing the rights of laborers and materialmen to claim the benefit of the bond." *Triple Cities*, 136 N.Y.S.2d at 463. Accordingly, the *Triple Cities* court read into the bond a statutory requirement that a supplier have a valid lien in order to recover under the bond.[7]

▉ The purpose of § 137 is to provide additional protection above and beyond that afforded by New York State lien law, N.Y.Lien Law § 1 *et seq.* (Consol.1993). *Chittenden*, 43 N.E.2d at 462; *Spanos Painting Contractors, Inc. v. Union Bldg. & Constr. Corp.*, 334 F.2d 457 (2d Cir.1964), *cert. denied*, 380 U.S. 912, 85 S.Ct. 897, 13 L.Ed.2d 798 (1965). To that end, the statute is to be liberally construed to effectuate its purpose. *Chittenden*, 43 N.E.2d at 462.

> The courts of this country have generally given to statutes intending to secure to those furnishing labor and supplies for construction of buildings a liberal interpretation, with a view of effecting their purpose to require payment to those who have contributed by their labor or material to the erection of buildings to be owned and enjoyed by those who profit by the contribution of such labor or materials.

*Extruded Louver Corp. v. McNulty*, 34 Misc.2d 566, 226 N.Y.S.2d 220, 225 (Sup.Ct.), *rev'd on other grounds*, 18 A.D.2d 661, 234 N.Y.S.2d 902 (1962) (citing *Flagstaff Silver*

---

7. Such a requirement was part of § 137 at that time.

*Min. Co. v. Cullins,* 104 U.S. 176, 26 L.Ed. 704 (1881)).

■ Consistent with this construction, this court holds that, to the extent that the terms of the subject bond are more restrictive than those mandated by § 137, its terms are unenforceable. To enforce the requirement that the materials be delivered to the site of the Housing Projects would be contrary to the principles of statutory construction articulated above and would undermine the purposes of § 137.

The cases cited by IFIC are not to the contrary. *Salvino,* 580 A.2d 853; *Reliance Universal, Inc. v. Ernest Renda Contracting Co.,* 308 Pa.Super. 98, 454 A.2d 39, 45 (1982); *Can–Tex Indus. v. Safeco Ins. Co.,* 460 F.Supp. 1022, 1025 (W.D.Pa.1978).[8] In fact, on closer examination, they tend to support the above construction. None of the cases involved bonds which contained provisions narrower than those of the statute pursuant to which they were issued. In *Salvino* and *Can–Tex,* the language of the bonds at issue tracked that of the authorizing statutes. Thus, the *Salvino* court, construing a Pennsylvania statute, held that, "[w]here the bond is statutorily required and the bonds terms are framed in the language of the statute, the obligations to which the surety agreed are specifically stated in and limited by the bond *and are those obligations required by the statute.*" 580 A.2d at 856 (emphasis added). The court reasoned that because "the wording of the statute is narrow[,] . . . bonds drafted pursuant to the statute may be equally narrow." *Id.* Section 137 is not written as narrowly as the Pennsylvania stat-

ute at issue in *Salvino.* Further, the *Salvino* court did not say that the bond could be narrower than the statute which authorized and required the bond. It only asserted that the bond could be *as narrow* as the statute permitted.

Similarly, in *Can–Tex,* the court held that "the law cannot impute an intent to cover such additions *beyond the statutory requirements* of the Payment Bond without express inclusion in the Bonding Agreement." 460 F.Supp. at 1025 (emphasis added). The court did not say that the law cannot impute an intent to cover those subjects mandated by statute.

*Reliance* is not applicable.[9] That case merely asserted that the language of the bond controls the agreement between a supplier and contractor. 454 A.2d at 45. It did not address the construction of a statutory bond which is more restrictive than the statute pursuant to which it was issued.

Therefore, the delivery prong of the above-mentioned diversion exception test is satisfied in this case.

### C. *The Intended Use of the Pennex Materials*

■ IFIC also disputes the final prong of the diversion exception test. IFIC asserts that Pennex cannot prove that the subject materials were purchased for use in the Housing Projects. Pennex, on the other hand, asserts that there is no genuine dispute that the materials at issue were purchased specifically for use at the Housing Projects. In support of this assertion, Pen-

8. The parties apparently agree that New York law governs the dispute at hand. IFIC has cited several Pennsylvania cases, asserting that New York and Pennsylvania law are similar with respect to the issues for which the cases are cited. The court need not address this contention, however, as the cited Pennsylvania cases are distinguishable on other grounds.

9. One other case deserves comment. At first blush, *Gernatt Asphalt Products, Inc. v. Bensal Construction, Inc.,* 60 N.Y.2d 871, 470 N.Y.S.2d 362, 458 N.E.2d 821 (1983) (adopting dissent in lower court opinion at 90 A.D.2d 993, 456 N.Y.S.2d 590 (App.Div.1982)), may appear to undercut this court's reasoning. On closer examination, however, this court does not believe it does so. In *Gernatt,* the claimant supplier seek-

ing to recover under the payment bond was not a supplier of a contractor but, rather, was one step further removed, i.e., it was a supplier to a supplier. The claimant was not within the protection of New York lien law. The *Gernatt* court asserted that a surety "can limit its own liability by writing the bond in a clear fashion, expressly limiting coverage to those who furnish materials directly to contractors or subcontractors." 456 N.Y.S.2d at 592. However, the court made this statement in the context of a case in which the surety had written its bond in language broader than the statute required. Therefore, this case stands for the proposition that a surety may write its bond to limit its liability to that required by the statute pursuant to which it is issued.

nex provided testimony from Joseph Golec, the Pennex Sales Manager who negotiated the supply contract with Bettina Kapp, the President of Air Master, James Hillig, Air Master's Purchasing Manager, and Harold Kapp, Chairman of the Board and sole owner of Air Master.

Mr. Golec testified in his deposition that Ms. Kapp told him during their initial conversation that Air Master "had bid on a New York Housing Authority job involving three locations and that if they got that, they would highly consider giving that contract to Pennex Aluminum." (Golec Dep. at 19–20, Motion, Ex. F.) During subsequent conversations with Ms. Kapp, Mr. Golec inquired into "the status of the contract, was it let by the Housing Authority, did Air Master get it, and, if they did, would they consider Pennex as a vendor." (*Id.* at 20.) Subsequently, an order was placed by Ms. Kapp with Mr. Golec. (Confirmation letter from Golec to B. Kapp, dated Aug. 28, 1990, Def.App. at 100.)

Mr. Hillig testified that, Ms. Kapp "spoke to me one day [in the fall of 1990] about the possibilities of placing an order with Pennex Aluminum." (Hillig Dep. at 10, Reply, Ex. C.) This conversation involved projects at Lattimer Gardens and Twin Parks, "a job ... that was coming through for a lot of weight." (*Id.*) At that time, the company practice was for Ms. Kapp to choose the supplier and negotiate a price. After Ms. Kapp chose the company from which materials were to be purchased, Mr. Hillig would place an order "to cover the material for a particular job.... I would order by the job." (*Id.* at 12, 15.) Mr. Hillig would place the job name on certain large purchase orders because

> it helps me to go back in a period of time and say we have our tails covered for this job.... I would put a name in that customer box right there to help me know that this particular job has been covered. But it's only basically for my own use from a reference point.

(*Id.* at 44.) Further, each Air Master purchase order at issue identifies a specific building in the box labelled "Customer." (Motion, Ex. H; Reply at 6, 9.)

Mr. Kapp testified that Air Master ordered certain specially fabricated parts from Pennex. (H. Kapp Dep. at 28–29, Motion, Ex. J). There is no question that these parts were ordered specifically for the subject Housing Projects. *See* discussion, *supra,* at 776–77.

In response to these contentions, Defendants assert that there is a genuine issue of material fact as to whether at least the standard materials were purchased exclusively for the Housing Projects. In support of this, Defendants offer the deposition testimony of Bettina Kapp. Ms. Kapp testified that she had approached Pennex because Air Master was "looking for a third supplier to purchase aluminum. And at the time, we had a substantial amount of work on my side, both housing and private work." (B. Kapp Dep. at 14, Def.App. at 54.) When asked if Air Master was looking for a third supplier for all of its requirements or just for the particular Housing Projects, Ms. Kapp responded, "All of our requirements." (*Id.* at 15.)

Harold Kapp testified that the notation of job names in the "Customer" box was something done only on larger projects: "When the jobs got to be more than a certain quantity of windows, let's say the larger jobs, then the purchasing department would so note that they had covered those larger jobs by putting a name on them." (H. Kapp Dep. at 21–22, Def.App. at 15–16.) As noted above, the Air Master's Purchasing Manager testified that these notations were, "to help me know that this particular job has been covered. But it's only basically for my own use from a reference point." (Hillig Dep. at 44, Reply, Ex. C.)

Defendant's responses, however, are not inconsistent with the testimony offered by Plaintiff. The fact that Ms. Kapp intended to or did use Pennex as a supplier for other projects does not contradict Plaintiff's assertion that the particular orders placed by Mr. Hillig were intended for the Housing Projects. Further, the fact that Ms. Kapp began negotiating with Pennex in August 1990, near the time of their bid and the award of the Housing Project contracts only bolsters this conclusion. At or around the same time, Air Master admits that it specially ordered

parts for the Housing Projects from Pennex. Even if Mr. Hillig used the notation in the customer box only for his reference, it is clear from his testimony that the material he ordered was intended to ensure sufficient inventory to meet the needs of the Housing Projects, one of Air Master's largest contracts.

Thus, this court concludes that there is no genuine issue of material fact that the materials purchased by Air Master from Pennex were intended for use in the Housing Projects.

## V.  Division of Liability Between Bonds

IFIC argues that Pennex should not recover because it has made a single undifferentiated claim against two separate bonds. The court would first note that this claim was not pled as an affirmative defense. That alone is sufficient reason to defeat this contention. In any event, this court does not find IFIC's argument convincing.

First, the purchase order forms indicate the particular building and, therefore, the bond to which they relate. (Motion, Ex. H; Reply at 6, 9.)  Second, it would be fairly simple to determine how much of the material was required for each building and apportion the amounts between the bonds.

Ultimately, such calculations are not necessary in this case, however. This is not a case in which two different entities hold the two bonds. This court has found that Pennex is entitled to recover the full amount due it under one or the other bond. IFIC is the party responsible for covering losses under both of the bonds. There has been no assertion that the funds of either bond are insufficient to cover the entire loss. Indeed, the face amounts of the bonds are $599,990.00 and $630,000. (Motion, Ex. A.)  Therefore, on the facts of this case, the court does not find this ground meritorious.

## VI.  Attorney Fees and Interest

■ Pennex has requested attorney's fees alleging that IFIC's defense was interposed without substantial basis in law or fact. Section 137 provides the court with discretion to award attorney's fees in such cases:

In any action on a payment bond furnished pursuant to this section, any judgment in favor of a subcontractor or material supplier may include provision for the payment of interest upon the amount recovered from the date when demand for payment was made pursuant to the labor and material payment bond and provided further that the court may determine and award reasonable attorney's fee to either party to such action when, upon reviewing the entire record, it appears that either the original claim or the defense interposed to such claim is without substantial basis in fact or law.

N.Y.State Fin.Law § 137, subd. 4(c).  *See, e.g., Riluc Co. v. Reliance Ins. Co.,* 181 A.D.2d 1048, 582 N.Y.S.2d 585 (App.Div. 1992).

This court does not believe that IFIC's defense was without a substantial basis in law or fact. Accordingly, Pennex's request for attorney's fees is denied.

Pennex has also requested an award of statutory interest of nine percent running from December 12, 1991. Section 137, subd. 4(c) allows the court discretion to award the "payment of interest upon the amount recovered from the date when demand for payment was made pursuant to the labor and material payment bond." N.Y.State Fin.Law § 137, subd. 4(c).

■ An award of interest is designed to "compensate a person who has been temporarily deprived of the use of moneys to which he or she is entitled." *Love v. State,* 164 A.D.2d 155, 561 N.Y.S.2d 945, 946 (App.Div. 1990) *aff'd,* 78 N.Y.2d 540, 577 N.Y.S.2d 359, 583 N.E.2d 1296 (1991).  Under New York law, the rate of interest to be awarded in the absence of statutory specification to the contrary is nine percent per annum. N.Y.Civ. Prac.L. & R. § 5004.

■ Pennex made a formal demand upon IFIC for payment under the bonds on December 12, 1991.  IFIC has not disputed that Pennex would not be entitled to the payment of interest in the event that it prevailed. This court has found IFIC liable under the bonds.  IFIC has been denied the use of funds to which it had legal right as of De-

cember 12, 1991. Accordingly, the court will award Pennex statutory interest from that date.

An appropriate order will follow.

## ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1) Plaintiff's motion for summary judgment is **GRANTED** in favor of Plaintiff and against defendant International Fidelity Insurance Company in the amount of $91,-333.72, plus interest at a rate of nine percent (9%) per annum running from December 12, 1991.

2) The Clerk of Court is directed to defer the entry of judgment until the conclusion of the third party claims in this action.

3) A case management conference will be conducted by the court on Friday, April 23, 1993 at 8:45 a.m. in the chambers of Courtroom No. 2, Ninth Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania, for the purpose of establishing the trial track for the third party claims in this action. This conference will be *in person* unless a party requests that the conference be held by telephone and the request has the concurrence of all parties. It will then be the responsibility of the requesting party to so inform the court and to place the conference call.

4) The primary purpose of this conference will be to establish case management deadlines to enable the remainder of this action to go forward as efficiently as possible. Participation in this conference by counsel or by *pro se* litigants is *mandatory.*

5) If counsel of record is unable to participate in the conference, the court shall be notified of the name of the substitute counsel two business days in advance of the date of the conference. The telephone number to call is (717) 782-3938.

6) Counsel are advised to consult one another prior to this conference and discuss the following:

a) the opportunity to consent to the exercise of civil jurisdiction of this case by a magistrate judge. *See* attachments. If this election is made, the court staff must be advised to cancel the case management conference;

b) the anticipated length of the discovery period;

c) the likelihood of the filing of dispositive motions and the length of time required to file the motions once discovery has ended; and

d) their projection as to when the case will be ready for trial;

7) The parties are advised that it is the policy of this court to maintain a projected *one year* trial date from the date the complaint is filed.

8) The parties are advised that once the deadlines have been established extensions of those time periods will not be granted, except under exceptional circumstances.