**GRAHAM ARCHITECTURAL PRODUCTS CORP.,**
Plaintiff,

v.

**ST. PAUL MERCURY INSURANCE COMPANY, Defendant.**

St. Paul Mercury Insurance Company,
Third–Party Plaintiff,

v.

**Riverview Architectural Products, Inc., Gary A. Flemming, Hope Flemming, Adam J. Waite, David A. Walter, Jane C. Walter, Keith A. Walker, and Shelly L. Walter, Third–Party Defendants.**

No. 00–CV–6204.

United States District Court,
E.D. New York.

Jan. 27, 2004.

Mark Rosen, Esq., McElroy Deutsch & Mulvaney, New York, NY, for the Plaintiff.

William J. Tinsley, Jr., Esq., Thomas J. Demski, Esq. Sills Cummis Epstein & Gross, P.A., New York, NY, for the Defendant and Third–Party Plaintiff.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Invoking diversity jurisdiction, plaintiff Graham Architectural Products Corp. ("Graham") seeks payment from defendant and third-party plaintiff St. Paul Mercury Insurance Company ("St.Paul") under a material and labor payment bond issued by St. Paul to third party defendant Riverview Architectural Products, Inc. ("Riverview"). Graham and St. Paul both move for summary judgment. Principally at issue is whether a subcontractor may recover against a defaulting contractor's surety for material or labor costs incurred by the subcontractor in the fabrication of goods which the subcontractor would not deliver to the contractor prior to the default unless it was first paid. For the reasons set forth below, the Court grants summary judgment in St. Paul's favor.

## BACKGROUND

The following facts, drawn from the pleadings, affidavits, Local Rule 56.1 statements, and the parties' representations made during oral arguments on September 16, 2003 and January 12th, 2004, are uncontested. *See* Fed.R.Civ.P. 56.

## I.  The Agreements

### A.  The Payment Bond

On or about June 29, 1998, Riverview contracted with the New York City School Construction Authority ("SCA") to furnish and install approximately 480 replacement windows for Public School 89 in the Bronx, New York (the "Project"). St. Paul bonded the Project for Riverview, issuing a performance bond and a labor and material payment bond (the "Payment Bond"). The Payment Bond, in the amount of $1,870,000, stated in pertinent part:

NOW, THEREFORE, THE CONDITIONS OF THIS OBLIGATION is such that if the Principal [Riverview] shall promptly make payment to all claimants as hereinafter defined, for all labor and material reasonably required for use in the performance of the Contract, then this obligation shall be void; otherwise such obligation shall remain in full force and effect, subject, however, to the following conditions:

1.  A claimant is defined as one having a direct Contract with [Riverview] or with a Subcontractor of [Riverview] for labor, material, or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract.

2.  [Riverview] and Surety [St. Paul] hereby jointly and severally agree with the [SCA] that every claimant as herein defined, ninety (90) days after the date on which the last of such claimant's *work or labor was done or performed, or materials were furnished by such claimant,* may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may

be justly due claimant, and have execution thereon.

Affidavit of Diane Schumaker ("Schumaker Aff.") at Ex. A (Payment Bond) (emphasis added). Nothing in the Payment Bond obligated St. Paul to assume Riverview's contractual obligations with its subcontractors in the event of any default by Riverview.

## B. The Supply Agreement

After commencing work on the Project, Riverview experienced financial difficulties. On September 23, 1999, it sold most of its equipment to Graham and leased its York, Pennsylvania window manufacturing facility to Graham. As part of that transaction, Riverview and Graham entered into a Supply Agreement whereby Graham agreed to fabricate and supply Riverview with windows for the Project, as well as for other specified jobs. With respect to the Project, the Supply Agreement provided that if Riverview's account with Graham fell into arrears, Graham would have no obligation to supply any windows to Riverview until the account was brought current:

> If at any time Riverview's payment account with Graham under this Agreement falls into arrears, Graham's obligation to supply Windows to Riverview under this Agreement and Graham's obligation to pay Riverview for any Inventory . . . used in the manufacture of Windows under this Agreement shall be suspended until such payment account no longer is in arrears. Graham may, in its sole discretion, refuse orders, require payment in full, ship C.O.D. or halt shipments in transit if Riverview's payment account with Graham is in arrears.

Supply Agreement at § 14.

## II. Graham's Refusal To Deliver

To proceed with the Project, Riverview provided Graham with a list of its vendors and its purchase orders. Graham prepared identical purchase orders in its own name, issued them to the vendors, and paid the vendors as they provided the materials to Graham for the fabrication of the windows. After incurring considerable expense purchasing materials for the Project, Graham, pursuant to the Supply Agreement, submitted an invoice to Riverview. Pleading financial distress, Riverview failed to pay, prompting a December 1999 meeting with St. Paul, Graham, Riverview and Riverview creditors. At the meeting, Graham estimated it would cost at least $480,000 to complete the work on the Project.

By the end of January of 2000, Riverview still had not paid the outstanding invoice; neither had it paid subsequent invoices. By letter dated January 31, 2000, Graham notified Riverview that it was exercising its rights under the Supply Agreement:

> As you know, Riverview has repeatedly been unable to honor Graham's invoices issued pursuant to the Supply Agreement. . . . This chronic state of default has forced Graham Architectural to exercise its rights under Paragraph 14 of the Supply Agreement and . . . Graham will no longer ship materials manufactured under the Supply Agreement on terms other than C.O.D.

Affidavit of Brett M. Popolow at Ex. D. Graham repeated its position in a March 17, 2000 letter to Riverview, stating: "It is Graham's position that the required terms be payment upon delivery of windows or prior to the release of any shipments[,]" and that "no shipment will be authorized for release unless the payment terms as outlined above have been finalized." *Id.* at Ex. E.

Although it had not received payment, Graham continued with the assembly of

the windows; by April of 2000, Graham had fully assembled forty-seven windows, partially assembled others, and had cut and machined a variety of other components. During the assembly process, Graham discovered that some of the materials provided by the vendors were slightly off-color, making the forty-seven completed windows non-conforming under the SCA Contract. Graham promptly notified Riverview of the shading problem. The precise cause of the mismatched shading is not clear, but the parties agree that it was not Graham's fault.

The SCA terminated Riverview from the Project on April 24, 2000, thereby obligating St. Paul under its performance bond to step into the breech. As of May 1, 2000, Riverview still had not paid Graham's invoices. On May 9, 2000, apparently unaware that Riverview had been terminated, Graham wrote to Riverview: "In January and again in March, we ... informed [Riverview] that Graham would not release any windows for shipment without payment for its work on a C.O.D. basis.... [W]e want to remind you that it is still a condition of our willingness to complete the work." *Id.* at Ex. G.

On May 23, 2000, St. Paul requested that Graham provide a quote to complete the Project. Graham responded on June 14, 2000, quoting a price of $816,319.98. In St. Paul's view, Graham's response was too high; accordingly, it re-bid the Project. Graham did not submit a bid, and St. Paul selected another contractor, Stealth Windows, which successfully completed the work and received payment from St. Paul.

Graham never delivered any of the Project's windows and maintains possession of the forty-seven completed windows it fabricated, the partially-assembled windows, and all remaining component parts. It seeks to recover $260,766.35, representing its material costs for the Project; Graham has not broken down these costs between completed windows, partially-assembled widows, and remaining parts. It also seeks to recover $42,171.82, representing its labor costs in assembling the windows.

## III. Parties' Contentions

Citing the remedial purpose undergirding the bonding of public works projects— that suppliers of materials and labor be reimbursed for costs expended in good faith—Graham contends that the delivery of materials is not necessary to satisfy the Payment Bond's "furnishing" requirement when delivery is not made because of the non-payment of outstanding invoices or is thwarted for reasons beyond the supplier's control. It also asserts that the costs of materials that are incorporated into specially fabricated products, regardless of the state of completion, should be recoverable because such goods are not capable of otherwise being used. As for its labor costs, Graham contends that regardless of whether materials were furnished, "work or labor was done or performed" in connection with the Project, which is all the Payment Bond required for recovery of such costs. Payment Bond at ¶ 2.

St. Paul responds that it is responsible for only those obligations imposed by the Payment Bond, and that "furnishing" entails actual delivery, or at least a tender, of the materials, whether or not specially fabricated. It argues that Graham's decision to insist on payment prior to or upon delivery was "unilateral and unwise," Memorandum of Law in Support of Motion for Summary Judgment at 12, and amounts to a contract dispute between Riverview and Graham which "cannot now be foisted upon St. Paul in the guise of a bond claim." *Id.* Although St. Paul does not dispute that Graham incurred $42,171.82 in labor costs, it argues that without the materials being furnished, la-

bor costs cannot be separately recovered under the Payment Bond.

## DISCUSSION

### I. Overview of Suretyship Law Governing New York Public Works Projects

"Suretyship, in a generic sense, originated ... as a three party arrangement intended to provide personal security for the payment of a debt or the performance of an obligation." *The Law of Suretyship,* Tort and Insurance Practice Session at 2–1, American Bar Association (1993) (Edward G. Gallagher, ed.). There are three basic kinds of surety bonds: bid bonds, performance bonds, and payment bonds. *Id.* at 3–1. Bid bonds are "intended to keep frivolous bidders out of the bidding process by securing that the successful bidder will enter into the contract and provide the required performance and payment bonds." *Id.* at 3–2. A performance bond "is a 'joint and several promise by the surety and the bond principal to the obligee that the principal will fully and faithfully perform all its obligations in the contract.'" *Id.* (citation omitted). The purpose of a performance bond is to protect the "project owner (the obligee) in the event the bonded contractor (the principal) defaults." *Id.* at 7–1. A payment bond, in contrast, "provides the remedy of payment to unpaid claimants who supply labor or materials to a construction project." *Id.* at 3–3.

It is axiomatic that the Court, sitting in diversity, must apply New York law on substantive matters such as the interpretation of payment bonds for public works projects. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In New York, protection on public projects was first afforded by § 5 of the New York Lien Law, which provides that "[a] person performing labor for or furnishing materials to a contractor, his subcontractor or legal representative, for the construction of a public improvement pursuant to a contract by such contractor and the state or a municipal corporation ... shall have a lien ... to the extent of the amount due or to become due on such contract." N.Y. Lien Law § 5. The rationale behind § 5, as well as behind those provisions of the New York Lien Law that provide for the imposition of liens on private projects, is that a party should be entitled to a lien when it has added something of value to the property and has not been paid. *See P.T. & L. Constr. Co., Inc. v. Winnick,* 59 A.D.2d 368, 399 N.Y.S.2d 712, 713 (3d Dep't 1977) (interpreting § 5: "[t]he theory upon which the Lien Law grants relief is that the lienor, by his labor or materials, or both, has added something of value to the property"); *Schaghticoke Powder Co. v. Greenwich & J. Ry. Co.,* 183 N.Y. 306, 310, 76 N.E. 153 (1905) (interpreting § 3 of the Lien Law, which authorizes liens on privately owned real estate: "[t]he underlying principle of all legislation of this character is that a person who, at the request or with the consent of the owner of real property, enhances its value by furnishing materials or performing labor for the improvement thereof, should be deemed to have acquired an interest in such property to the extent of the value of such materials or labor"). As the court in *Winnick* emphasized,

> In construing section 5 of the Lien Law it should be remembered that liens provide a limited remedy and are generally used to recover the fair value of that which, because of its use, is now physically or logically unrecoverable.... [E]ntitlement to relief under the Lien Law is predicated upon a showing that labor or materials have been furnished

and have been expended or used so as to have become an inseparable part of the object of the particular contract.

*Id.*

The protections afforded by § 5 of the Lien Law, however, are limited in two respects. First, because "property held by a municipal corporation for public use ... is not subject to seizure and sale on execution[,]" *Leonard v. City of Brooklyn*, 71 N.Y. 498, 500 (1877), a lien under § 5, unlike a private lien, "attaches not to the land and the improvements thereon, but to any sum that the municipality may have appropriated for the purpose of making the improvement." *John Kennedy & Co. v. New York World's Fair 1939*, 260 A.D. 386, 22 N.Y.S.2d 901, 903 (2d Dep't 1940). *See also Lincoln First Bank, N.A. v. Spaulding Bakeries Inc.*, 117 Misc.2d 892, 459 N.Y.S.2d 696, 700 (Sup.Ct. Broome Co.1983) ("The underlying intention of the Lien Law directs that a private lien shall attach to real property privately owned, whereas a public lien attaches solely to the funds of the public corporation due under the contract for the improvement.").

Second, New York courts interpreting § 5 have "uniformly held that the right to a lien is dependent upon something being due or becoming due to the contractor or furnished under *his* contract[,]" *Upson v. The United Engineering and Contracting Co.*, 72 Misc. 541, 130 N.Y.S. 726, 730 (Sup.Ct. Niagra Co.1911); thus, if nothing is due on the contract between the contractor and the public entity, an individual supplying materials or labor for the project cannot have a lien under § 5. *See id.* ("[a] party furnishing materials or doing work, relying upon the lien given by statute for security, must examine the contract with the owner; for it is only to the extent of what is due or to become due upon this contract that his lien can attach"); *Chittenden Lumber Co. v. Silberblatt & Lask-*

*er, Inc.*, 288 N.Y. 396, 400, 43 N.E.2d 459 (1942) (commenting on § 5: "the courts, and apparently the Legislature, recognized the fact that 'if ... the contractor owes no money ... then laborers employed by the subcontractor, like persons furnishing materials to the subcontractor, may go unpaid' ") (quoting *Devitt v. Schottin*, 274 N.Y. 188, 194, 8 N.E.2d 481 (1937)); *cf. Application of 101 Park Ave. Associates*, 99 A.D.2d 428, 470 N.Y.S.2d 392 (1st Dep't 1984) ("The statutes protecting the availability of [private] mechanic's liens militate against a holding that, because the sum available to a subcontractor is restricted to that owed to his general contractor, the former's right to a lien is somehow restricted. Section 3 of the Lien Law gives an unpaid subcontractor an unqualified right to a mechanic's lien.").

In 1938, "[i]n an apparent effort to afford greater protection to laborers and materialmen on public improvement contracts with the State," *Chittenden Lumber Co.*, 288 N.Y. at 400, 43 N.E.2d 459, § 137 of the New York Finance Law was enacted, which provides:

1. In addition to other bond or bonds, if any, required by law for the completion of a work specified in a contract for the prosecution of a public improvement for the state of New York a municipal corporation, a public benefit corporation or a commission appointed pursuant to law, or in the absence of any such requirement, the comptroller may or the other appropriate official, respectively, shall nevertheless require prior to the approval of any such contract a bond guaranteeing prompt payment of moneys due to all persons furnishing labor or materials to the contractor or his subcontractors in the prosecution of the work provided for in such contract.

* * *

3. Every person who has furnished labor or material, to the contractor or to a subcontractor of the contractor, in the prosecution of the work provided for in the contract and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was performed or material was furnished by him for which the claim is made, shall have the right to sue on such payment bond in his own name for the amount, or the balance thereof, unpaid at the time of commencement of the action[.]

N.Y. Finance Law § 137. Although nothing in § 137 changed the rule that liens cannot attach against governmentally-owned property, by providing for payment bonds under which claimants can seek recovery against a surety for labor or materials furnished in the prosecution of a public project, even if nothing is due by the owner to the contractor, § 137 addressed the "lack of protection given by [§ 5 of the] Lien Law to those who furnish materials in connection with State contracts[,]" *Chittenden Lumber Co.*, 288 N.Y. at 403, 43 N.E.2d 459; thus, claims under payment bonds issued pursuant to § 137 are not conditioned on whether amounts were due under the prime contract, but rather on whether labor or materials have been "furnished." In sum, as a consequence of the enactment of § 137, a claimant who furnishes labor or materials on a New York public works project for which a payment bond has been issued may either seek a lien pursuant to § 5 (to the extent of the amount due or to become due on the contract between the contractor and the owner), or submit a claim under the payment bond. In all payment bonds issued pursuant to § 137, "the statutory text is to be read into the bond." *Harsco Corp. v.*

*Gripon Const. Corp.*, 301 A.D.2d 90, 752 N.Y.S.2d 59, 62 (2d Dep't 2002).

Section 137 was based on its federal counterpart, the Miller Act, which requires a payment bond on any public contract exceeding $100,000 "for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract[.]" 40 U.S.C. § 270a. Just as § 137 was enacted to rectify inequities arising under the Lien Law, so too did the Miller Act arise out of the inadequate protections that its predecessor, the Heard Act, 28 Stat. 278 (1894), afforded to those who supplied labor and materials on federal public works projects. Prior to its 1935 repeal, the Heard Act required a payment bond protecting "any person ... who has furnished labor or materials used in the construction" of a public works project; hence, recovery for labor and materials was permitted only to those "who proved that they had furnished material which had been actually used in the building." *United States ex rel. Purity Paint Products Corp. v. Aetna Casualty & Surety Co.*, 56 F.Supp. 431 (D.Conn.1944). Thus, the Miller Act extended protections to those whose labor and materials were made available for use in the project, even if their labor or materials were not actually used in the project. Consideration of pertinent Miller Act cases is appropriate because New York courts treat Miller Act decisional law as precedential. *See R.J. Russo Trucking & Excavating, Inc. v. Pennsylvania Resource Systems, Inc.*, 169 A.D.2d 239, 573 N.Y.S.2d 95, 98 (3d Dep't 1991) ("Federal Miller Act decisions are of precedential value, inasmuch as State Finance Law § 137 was modeled after the Miller Act."). The Miller Act is the "sole remedy" for those who are not paid for materials or labor supplied in federal public works projects. *Active Fire Sprinkler Corp. v. U.S. Postal Service*, 811 F.2d 747, 754 (2d Cir.1987) ("the Miller Act offer[s]

the sole remedy because no lien ... attach[es] to property held by the United States government").

Despite the remedial purpose of § 137, "[a] payment bond issued under State Finance Law § 137 is not intended to insure the supplier of material against every risk accepted by the surety's principal in a contract." *Harsco Corp.*, 752 N.Y.S.2d at 62. *See also Clifford F. MacEvoy Co. v. U.S. for Use and Benefit of Calvin Tomkins Co.*, 322 U.S. 102, 107, 64 S.Ct. 890, 88 L.Ed. 1163 (1944) ("Congressional intent to protect those whose labor and materials go into public projects ... does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds."). When considering a surety's obligations under a bond, the Court must be mindful that "the responsibility of the surety is not to be extended or enlarged by implication or construction, and is *strictissimi juris.*" *Tri–State Employment Servs., Inc. v. Mountbatten Sur. Co., Inc.*, 99 N.Y.2d 476, 483, 758 N.Y.S.2d 595, 788 N.E.2d 1023 (2003) (quoting *People v. Backus*, 117 N.Y. 196, 201, 22 N.E. 759 (1889)). Under the rule of *strictissimi juris*, the liability of a guarantor "shall not extend beyond the precise stipulations of the guaranty." *Rieser v. Speyer*, 239 A.D. 405, 267 N.Y.S. 670, 672 (1st Dep't 1933). In short, "the surety's liability is to be strictly limited by the scope and meaning of its agreement." *Davis Acoustical Corp. v. The Hanover Ins. Co.*, 22 A.D.2d 843, 254 N.Y.S.2d 14, 16 (3d Dept.1964). *See also United States for the Use and Benefit of Maris Equip. Co., Inc. v. Morganti, Inc.*, 163 F.Supp.2d 174, 194 (E.D.N.Y.2001) ("even when a surety advances large sums of money to the contractor and becomes 'intimately involved' in the contractor's financial affairs, the surety will not, without more, face exposure beyond the parameters of its bond").

## II. Material Costs

Both § 5 of the Lien Law and § 137 of the Finance Law use forms of the verb "furnish." N.Y. Lien Law § 5 ("a person ... furnishing materials"); N.Y. Finance Law § 137 ("[e]very person who has furnished ... materials"). So, too, does the Payment Bond. Payment Bond at ¶ 2 (permitting claims for "materials [that] were furnished"). Under § 5 of the New York Lien Law, materials are "furnished" when they are "delivered ... to the contractor in good faith for the purpose of being used in the improvement." *Giant Portland Cement Co. v. State of New York*, 232 N.Y. 395, 403, 134 N.E. 322 (1922).

There are only two exceptions to this delivery requirement. The first, known as the "diversion exception," originated in the *Giant Portland Cement* case. There, two lots of cement were delivered to the construction site; one was diverted by the contractor and used for a different project, the other was retaken by the cement supplier when it appeared that the contractor would not pay for it. As to the former lot, the court permitted the imposition of a lien under § 5 of the Lien Law, reasoning that "a materialman who in good faith furnishes materials to a contractor with which to construct a building or build a road should not be deprived of his right to a lien because the contractor without his knowledge or consent diverts the material to some other purpose." *Id.* As to the batch of cement which the supplier reclaimed, the court reached the opposite conclusion, stating that "[w]e do not think a vendor can take back his materials and at the same time claim that they have been furnished for construction of an improvement." *Id.* at 406, 134 N.E. 322.

Neither the Court's research nor the parties' submissions has disclosed a New York case that addressed whether the di-

version exception applies in the context of § 137. Based on § 137's purpose and its use of the same root word—furnish—as is used in § 5, there is every reason to believe that New York courts would recognize the diversion exception in the context of a payment bond issued under § 137. Indeed, one federal court applying New York law has so held. *See Pennex Aluminum Co. v. Internat'l Fidelity Insurance Co.*, 818 F.Supp. 772, 780 (M.D.Pa.1993) (off-site delivery of materials satisfied the "furnishing" requirement under § 137; "[t]o construe the diversion exception to require actual delivery to the site of the project [rather than to the factory] would eviscerate the statute").

The second exception arises when the claimant tenders the materials rather than actually delivers them. This exception was recognized in *Lanahan Lumber Co., Inc. v. Spearin, Preston & Burrows, Inc.*, 496 F.Supp. 816 (M.D.Fla.1980), a Miller Act case. There, the plaintiff gave notice that the materials—treated lumber—were ready for delivery, but the defendant refused to accept them. The court denied defendant's motion to dismiss plaintiff's claim for labor and materials, reasoning that "to allow a contractor to prevail on the claim that his materialman never 'furnished or supplied' materials within the meaning of the Miller Act, when the contractor's own rejection allegedly short-circuited an attempt by the materialman to make the goods available, would only encourage wrongful rejections by contractors seeking to escape the proper purview of the Act." *Id.* No reported New York decision has yet addressed the applicability of the tender exception to § 5 or § 137, but the rationale of *Lanahan Lumber* is sound.

Graham has not satisfied either the diversion or tender exception; rather, it deliberately elected *not* to furnish the win-

dows, choosing instead to demand C.O.D. payment prior to delivery. Although Graham was entitled to invoke its rights under ¶ 14 of the Supply Agreement to withhold delivery, it cannot have it both ways—it cannot simultaneously refuse to even *tender* the windows, let alone deliver them, *and* demand payment under a payment bond that requires that the materials be "furnished." Graham's position is somewhat analogous to the claimant in the *Giant Portland Cement* case who, realizing that it would not be paid for the second batch of cement, physically took back the cement, thereby defeating its claim that it had furnished materials and was entitled to a § 5 lien. *See also F.L. Saino Manufacturing Co. v. Fireman's Fund Ins. Co.*, 173 Ga.App. 753, 328 S.E.2d 387 (1985) (stating, in denying claim under payment bond for materials that were not delivered because of nonpayment: "[i]t is evident that merely by manufacturing the goods requested, without any act of offering or delivering the goods, that appellant did not furnish, provide, supply or give them to Modular as is commonly contemplated by the use of the word 'furnish' ").

Relying on *Pennex Aluminum Co.* and *Bethlehem Steel Corp. v. United States Fidelity & Guaranty Co.*, 193 A.D.2d 1058, 598 N.Y.S.2d 873 (4th Dep't 1993), Graham proposes that the Court recognize a third exception: that delivery and/or tender be excused when the materials are specially fabricated. The Court declines Graham's request. As an initial matter, neither § 5, § 137 nor the Payment Bond explicitly distinguishes between materials and specially fabricated materials; had the legislature (or the surety) intended to offer special protections for fabricated materials, it could have done so. *See Swing Staging, Inc. v. Hartford Fire Ins. Co.*, 269 A.D.2d 193, 703 N.Y.S.2d 99, 100 (1st Dep't 2000) (noting that the terms of § 137 can "be expanded by agreement, thus providing

even greater protection to the materialman than the statute affords"). Such an exception would also run counter to the underlying purpose of the statute, to protect those who have supplied the materials and thereby "added something of value to the property." *Winnick*, 399 N.Y.S.2d at 713. By choosing to withhold the materials, Graham did not add any value to the Project. While it may be true that specially fabricated items may retain little, if any, residual value if not used in the project for which they were manufactured, the Court discerns no reason to shift the risk of loss to the surety when, as here, the subcontractor deliberately chose to condition delivery of the materials upon receipt of payment.

The Court also notes that in the context of determining whether a party is a subcontractor, and hence protected under the Miller Act, courts have concluded that "[c]laims by suppliers of specially fabricated materials are subject to the same treatment as claims for materials generally." *The Law of Payment Bonds* at 44 (Tort and Insurance Practice Session, American Bar Association (1998)) (Lybeck and Shreves, eds.) (citing cases). Further, reliance on the two cases Graham cites is not apt, for in both instances the specially fabricated items were actually delivered. *See Pennex Aluminum Co.*, 818 F.Supp. at 777 (noting that specially fabricated materials "were shipped by Pennex to Air Master's plant in Bensalem, Pennsylvania where they were incorporated into the windows manufactured by Air Master"); *Bethlehem Steel Corp.*, 598 N.Y.S.2d at 873 (noting that manufacturer of specially fa-

bricated steel "shipped" and "supplied" the steel).

The Court recognizes that payment bonds reflect a strong policy of safeguarding the efforts of suppliers of labor and materials and are to be liberally construed in accordance with their remedial purpose. When a party deliberately chooses to refuse to furnish materials, however, it has satisfied neither the requirement of the bond nor the underlying purpose of the statute. To hold otherwise would subject the surety to double liability if, as occurred here, the surety rebids the project and the subcontractor is not selected to complete the Project.

It was incumbent upon Graham to proceed with caution. It knew when it accepted its obligations under the Project that Riverview was financially troubled. It continued to incur expenses after being on notice that Riverview was not paying Graham's costs. After Riverview was terminated from the Project and St. Paul assumed control, Graham could have submitted a more competitive bid to complete the work. Graham, however, is not left without a remedy; it may pursue a breach of contract claim for its material costs against Riverview.

In sum, because Graham chose to withhold delivery of the completed windows until its invoices were paid, it cannot hold the surety liable under the terms of the Payment Bond for the cost of the completed windows, let alone for the partially-assembled windows and the remaining component parts.[1]

---

1. Because of Graham's insistence on payment before delivery, the Court need not address the issue of whether a surety would be liable under the "furnishing" requirement of a payment bond for nonconforming goods delivered or tendered by a faultless materialman. Resolution of this issue would not be free from doubt. *Compare Wynne v. United States*

*for the Use of Mid–States Waterproofing Co., Inc.*, 382 F.2d 699, 701 (10th Cir.1967) (permitting recovery under quantum meruit theory when plaintiff painting company·had to repaint structure due to nonconforming paint; "failure to provide suitable paint caused" plaintiff to incur extra material and labor costs) *and United States for Use of Ardmore*

### III. Labor Costs

The Court discerns no principled reason to treat Graham's claim for labor differently than its claim for materials. Given the co-extensive nature of § 5 and § 137 and their common underlying purpose in protecting those who add value to a project, logic dictates that those who refuse to furnish materials should not be permitted to recover the cost of labor expended to assemble the very materials that were not furnished. In this sense, labor claims for the cost of assembling materials is qualitatively different than labor claims arising from work performed directly at the job site; unless negligently performed, the latter moves the construction forward and thereby adds value to the project, whereas the former bestows no benefit to anyone until the assembled materials are furnished. *See Kingston Trust Co. v. State of New York,* 57 Misc.2d 55, 291 N.Y.S.2d 208, 210 (2d Dep't 1968) ("The statutory condition that a lien may be filed by a person performing labor for a contractor does not extend to labor performed on materials to be used in the improvement if such labor or services are not applied to their actual installation therein."); *New York Elevator Supply & Repair Co. v. Bremer,* 74 A.D. 400, 77 N.Y.S. 509, 510 (1st Dep't 1902) (denying lien for labor

*Concrete Material Co. v. Williams,* 240 F.2d 561, 563 (10th Cir.1957) (surety "liable for extra expense incurred by a materialman" when owner's representative's error caused furnished materials to be nonconforming) *with United States for Use of General Electric Co. v. Gunnar I. Johnson & Son, Inc.,* 310 F.2d 899, 903 (8th Cir.1962) (supplier initially delivered nonconforming, specially-fabricated component parts; "it is apparent that, until such time as [materials] were 'furnished' in such condition as to meet the engineering requirements and be ready and fit for installation as part of the system, no enforceable claim did or could arise") *and United States ex rel. Purity Paint Products Corp. v. Aetna Casualty & Surety Co.,* 56 F.Supp. 431

costs when claimant removed elevator, "substituted therefor an incomplete elevator, unfinished in every essential particular, and absolutely useless for purposes of operation"). As with its claim for materials, Graham may seek to recoup its labor costs through a breach of contract action against Riverview.[2]

### CONCLUSION

The Court grants summary judgment in St. Paul's favor and dismisses the complaint.

### SO ORDERED.

(D.Conn.1944) (plaintiff "must prove not only that he furnished [materials] but also that the [material] furnished was ... conforming"). *See also* N.Y. Uniform Commercial Code § 2-503(1) ("[t]ender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery") and § 2-508 (permitting seller to cure tender or delivery of nonconforming goods).

2. Although during oral argument on January 12, 2004 the Court indicated it would allow Graham's claim for labor, it reached its contrary conclusion after further consideration.